THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v IRVING PLEASANT, Respondent.

First Department, July 17, 1980

### APPEARANCES OF COUNSEL

*Cary W. Sucoff* of counsel *(Steven R. Kartagener* with him on the brief; *Mario Merola, District Attorney,* attorney), for appellant.

*Roger D. Olson* of counsel *(William Mogulescu,* attorney), for respondent.

### OPINION OF THE COURT

Ross, J.

■ This is an appeal by the People from an order granting defendant's motion to suppress all identification testimony at a trial as a result of his illegal arrest. We are persuaded that no aspect of the proposed identification testimony—pretrial lineup, or in-court identification—should be suppressed.

■ The inexhaustible reach of the Fourth Amendment has provided the judiciary, scholars and attorneys alike with a seemingly endless array of problems and issues. The exclusionary rule which finds its genesis in this amendment is a

judicially created mechanism designed to protect and guarantee those rights secured by the Fourth Amendment *(Stone v Powell,* 428 US 465; *United States v Calandra,* 414 US 338). This rule prohibits the introduction of evidence obtained in violation of the Fourth Amendment against the victim of an illegal search and seizure. This broad prohibition "extends as well to the indirect as to the direct products of such invasions" *(Wong Sun v United States,* 371 US 471, 484). However, this rule is not without limitations. "[I]t has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons" *(Stone v Powell, supra,* at p 486). The exclusionary rule has not been extended to Grand Jury proceedings *(United States v Calandra, supra),* or to evidence unlawfully seized which was later used to impeach a defendant who testified in his own defense *(Walder v United States,* 347 US 62). Nor has this rule been extended to exclude a witness' in-court identification *(United States v Crews,* 445 US 463). Almost three decades ago, the Supreme Court declared that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction [illegally] * * * There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will" *(Frisbie v Collins,* 342 US 519, 522). Thus, it is clear that not "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint' " *(Wong Sun v United States, supra,* at pp 487-488).

■ Although there are many varied theories utilized to justify the exclusionary rule, the primary argument, and the one most often advanced, is the deterrent effect upon future police activity *(United States v Calandra, supra,* at p 347; *People v McGrath,* 46 NY2d 12). Where evidence is sought to be suppressed as a result of an illegal search and seizure, a balancing test must be employed to weigh thoughtfully the "probable deterrent effect [of the exclusionary rule] against its detrimental impact upon the truth-finding process" *(People v McGrath, supra,* at p 21). Mindful of these tenets, we turn now to an analysis of the facts before us.

On October 4, 1976, two security guards, John Casey and Carlton Edwards, employed at a Bronx supermarket were robbed at gunpoint. The proceeds of this crime included a .38-calibre gun taken from Casey. The victims provided the police with an accurate description of the robbers. The detective in charge of this investigation, Edward Muller, had the victims look over 1,000 photographs of possible suspects. No positive identification was forthcoming. In the course of this investigation, Detective Muller transmitted an alarm, which eventually reached nationwide, containing the serial number of the stolen gun.

On December 17, 1976, defendant and two others, were arrested by Suffolk County police for, *inter alia,* criminal possession of weapons. One of the weapons seized was the gun taken in the Bronx robbery which was the subject of the alarm. On December 30, this information was transmitted to Detective Muller. Muller was given the names and dates of birth of the three men arrested in Suffolk County. One was Irving Pleasant, the defendant herein. Armed with this information, Muller retrieved from the New York City Police Bureau of Criminal Investigation a photograph of each man.

Between the date of the crime and the date on which Muller received defendant's name, the police displayed numerous additional photographs to the victims of the Bronx robbery. However, no identification was made. On March 8, 1977, the police showed the victims of the robbery two separate arrays of 10 photographs, and both victims positively identified defendant and Anthony La Borde. John Casey, who viewed the photo arrays independent of Edwards, exclaimed when he saw defendant's picture, "He took my gun and handcuffed me." Thereafter, defendant was indicted and charged with two counts of robbery in the first degree. On March 25, a lineup, at which defendant was represented by counsel, was conducted. Only Casey could identify defendant.

Several months later on August 22, 1977, after Pleasant's motion to suppress the weapons seized in Suffolk County was denied, he entered a plea of guilty to criminal possession of a weapon in the third degree and was sentenced as a predicate felon.

More than one year later on December 11, 1978, defendant's Suffolk County conviction was reversed and the motion to suppress granted. The court concluded that the Suffolk County police possessed "an insufficient basis upon which to premise

reasonable suspicion" *(People v La Borde,* 66 AD2d 803, 804). The court determined that the arrest was illegal and that the fruits of this arrest (i.e., the seized weapons, including the gun taken from the Bronx security guard) were the product of impermissible police conduct and ordered the indictment dismissed.

■ Prior to trial in the instant matter, defendant moved in Bronx County to suppress the identification testimony to be given by the victims of this crime. Defendant argued that the proposed identification is the direct result of prohibited police conduct. The hearing court agreed with defendant and suppressed all identification testimony on the grounds: "that there is a direct line between the arrest of the defendant and the identification by the witnesses, and that other than the arrest, there is no independent source or attenuating circumstance intervening which could possibly be a causal connection between the two." We disagree. The effect of this ruling will be to forever bar the introduction of eyewitness testimony which has an independent origin entirely free and distinct from subsequent proscribed police activity. This result surely could not have been within the contemplation of the exclusionary rule. Such an application will unjustifiably impede the truth-finding process and can have little or no deterrent effect on the offending authorities.

The Supreme Court in *United States v Crews (supra),* was confronted with a factual situation strikingly similar to that at bar. In *Crews,* the victim of a gunpoint robbery provided the police with a complete description of her assailant immediately after the crime's commission. Several days later the defendant was observed at the scene of the crime. At this time the police attempted to take defendant's picture, but were prevented by weather conditions. Defendant was thereafter taken into custody, ostensibly as a suspected truant, and photographed. This station house photograph was placed in a photographic array and displayed to the victim of the crime. The victim immediately identified the defendant. At a subsequent lineup and in court, the victim again identified defendant. We note that in *Crews,* the Supreme Court provided no reasons for finding the intervening photographic and lineup identifications suppressible. The Supreme Court did not disturb the lower court's suppression of the pretrial identification, pointing out that the government was not disputing that aspect of the suppression. Whatever the reasons for the gov-

ernment's concession in the *Crews* case, we see nothing in the facts of the present case that would logically require suppression of the pretrial identification. It is clear, that the defendant's face is not a suppressible "fruit" and that the in-court identification is not suppressible. Significantly, the court held that: "Respondent is not himself a suppressible 'fruit', and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct" (at p 474).

If defendant's arguments are accepted, in effect, his presence at trial would be suppressed. Such a result is unwarranted. In *Crews,* defendant also challenged his presence at trial. The court there stated that "he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest" (at p 474). *Crews* settles the question whether the person of defendant is a suppressible fruit. (See, also, *People v Mendez,* 28 NY2d 94.)

With respect to the pretrial corporeal identification, obviously, the victim's image of the defendant was formed in the victim's mind at the time of the commission of the crime, and a subsequent illegal arrest does not "infect the victim's ability to give accurate identification testimony" (p 472). The court ruled in *Crews* (p 477) as we do here, that the victim's independent recollections "both antedated the unlawful arrest and were thus untainted by the constitutional violation."

Like the court in *Crews,* we are confronted with proposed pretrial identification where the police possessed an accurate description of defendant supplied by willing witnesses prior to any Fourth Amendment violations. This knowledge was gained prior to, and independent of, the subsequent impermissible police conduct. The activities of the local investigating police authorities are unconnected in any manner to the conduct of the Suffolk County police against whom the deterrent influence of the exclusionary rule was invoked. Clearly no reasonable nexus exists between the tainted conduct of the Suffolk County police and the proposed identification testimony. Thus, other than the seizure of the weapon, the admissibility of which is not at issue here, the link between the investigation of the Bronx robbery and the proposed identification testimony is unencumbered by any impermissible conduct.

"The exclusionary rule enjoins the Government from benefitting from evidence it has unlawfully obtained; it does not

reach backward to taint information that was in official hands prior to any illegality" *(United States v Crews, supra,* at p 475; *People v Almestica,* 42 NY2d 222).

Prior to any Fourth Amendment violation, the New York City police had in their files defendant's picture, which was obtained on a prior occasion independent of the present crime or the Suffolk County arrest, and in their possession a complete description of defendant. The victim, presumably, had an indelible impression of the defendant's face. None of these elements are traceable to, and thus tainted by, subsequent impermissible police conduct.

In the facts before us the only information received from the Suffolk County police was defendant's name and date of birth. These facts, standing alone, unaccompanied by additional identifying characteristics lack probative value. By themselves they are of little or no evidentiary value. Once associated with the individual this composition is not a suppressible fruit *(United States v Crews, supra).*

As already noted, as regards the proposed pretrial identification testimony, we can perceive no infirmity as to this testimony and, therefore, it is admissible. In *Bynum v United States* (262 F2d 465) the court reversed defendant's conviction finding that the police lacked probable cause to arrest defendant and suppressed fingerprints taken from defendant while in custody. On defendant's subsequent retrial for the same offense, the government introduced a set of defendant's fingerprints retrieved from FBI files. On appeal, defendant's conviction was affirmed. The court determined that the prior FBI fingerprints were not tainted by the subsequent illegal arrest *(Bynum v United States,* 274 F2d 767, cert den 379 US 908). Although *Bynum* dealt solely with the admissibility of fingerprints, the police in the case before us obtained defendant's photograph, which is the cornerstone of the pretrial identification, under similar circumstances. The origin of this photograph was untainted by subsequent impermissible police conduct. Defendant's illegal arrest did not produce this evidence, rather, its existence was antecedent to any illegal conduct. The entire spectrum of proposed pretrial identification is cast in a foundation solidly free of the corrosive effects of proscribed police conduct. Defendant's unlawful arrest in Suffolk County "served merely to link together two extant ingredients in his identification" *(United States v Crews, supra,* at p 475).

Unlike *United States v Ceccolini* (435 US 268), upon which

our dissenting colleague relies, where the witness' testimony was produced as a direct result of the search, the ability of the identifying witnesses, Casey and Edwards, to recognize the defendant is not contingent upon the Suffolk County arrest. Moreover, in *Ceccolini,* the court provided six reasons for holding that the testimony of an eyewitness was admissible even after a violation of the Fourth Amendment had occurred:

1. the court held the testimony admissible on the grounds that it was volitional and of the witness' own free will and in no way induced by official authority. The facts before us clearly demonstrate a conscious choice, distinctly free of any hint of coercion or official solicitation, by the victims to testify;

2. the evidence in *Ceccolini* was not used in questioning the witness. Here also the illegally seized weapon in Suffolk County was not used to question the victim or buttress the identification;

3. in *Ceccolini,* substantial periods of time elapsed between the illegal search and the initial contact with the witness, and between this contact and the testimony at trial. Here the contact with the victims was immediate. The illegal search occurred months later at a time when the proscribed conduct could have no bearing on the victim's ability to remember or recall the facts of the crime. The victims' competent description of defendant was etched in their minds at the moment of the commission of the crime and this mnemonic representation was wholly uninfluenced or untouched by the subsequent illegal conduct two months later. The lineup occurred five months after the crime;

4. in *Ceccolini* both the identity of the witness and her relationship (i.e., employee to employer) with the owner of the illegally seized evidence were well known to the authorities. Here no relationship exists between the victims of the crime and their assailant. Moreover, the identities of the victims were well known to the police before the defendant's illegal arrest in Suffolk County;

5. in *Ceccolini* there was no evidence that the authorities conducted the illegal search with the intent of finding either evidence of an illicit gambling operation or a willing and knowledgeable witness to testify against the defendant. The circumstances of this case also demonstrate that this factor is not before us. The Suffolk County police were acting in response to a local citizen's complaint and were certainly not seeking to arrest defendant with the hopes of finding a

weapon stolen in a robbery in a distant county some months earlier. Nor were these authorities seeking to obtain a willing witness to testify against defendant since the witnesses' identities were already known to the investigating authorities;

6. the United States Supreme Court refused to suppress this testimony on the additional ground that to invoke the exclusionary rule would not have the slightest deterrent effect on police behavior. As the facts in this case amply demonstrate, any application of the exclusionary rule would hamper the administration of justice and would not provide even the slightest deterrent effect to police conduct. As the Supreme Court appropriately noted: "[A]lthough the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice" *(Stone v Powell,* 428 US 465, 491, *supra).*

Accordingly, the order, Supreme Court, Bronx County (GOLDFLUSS, J.), entered on October 19, 1979, which granted defendant's motion to suppress identification testimony, should be reversed, on the law, and defendant's motion denied.

SANDLER, J. (dissenting in part). The controlling authorities on the issues presented are *United States v Ceccolini* (435 US 268) and *United States v Crews* (445 US 463). The applicable rules developed in these decisions strongly indicate that the defendant's motion to suppress should be granted with regard to the pretrial identifications and otherwise denied.

*Ceccolini* involved the admissibility of the testimony of a witness discovered through a Fourth Amendment violation during an investigation into the defendant's suspected involvement in illegal gambling. Many months later, the defendant was called before the Grand Jury and testified with regard to the subject matter of the investigation. The witness, whose possession of relevant information had become known through the Fourth Amendment violation, gave testimony that resulted in the defendant's indictment for perjury. The Supreme Court held that the testimony of this witness was properly admitted into evidence because the connection between the lawless conduct of the police and the discovery of the challenged evidence had become so attenuated as to dissipate the taint.

In the court's opinion (per Mr. Justice REHNQUIST), the following was said (at pp 274-275): "An examination of these cases leads us to reject the Government's suggestion that we adopt what would in practice amount to a *per se* rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment. We also reaffirm the holding of *Wong Sun, supra,* at 485, that 'verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion.' "

· The opinion went on to consider the special nature of the exclusionary issue presented by live-witness testimony and concluded as follows (at p 278): "In short, since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required."

Contrary to the implication of this court's opinion, *Ceccolini* made it clear that the exclusionary rule does apply to the testimony of live witnesses derived by a Fourth Amendment violation, with the qualification that a closer causal link to the illegal conduct will be required before such testimony is excluded.

In *Crews,* the defendant, already a suspect, was illegally arrested for the purpose of taking his photograph to exhibit to the victim. The defendant was released after his photograph was taken. When the complaining witness identified his picture from a photograph array, the defendant was rearrested and again identified in a lineup.

The trial court denied the defendant's motion to preclude an in-court identification, but granted the motion to suppress the pretrial identifications. The Circuit Court of Appeals reversed the conviction, holding that it was error to allow the courtroom identification. The Supreme Court reversed in turn, holding that the in-court identification was not constitutionally impermissible and reinstated the conviction.

In the course of Mr. Justice BRENNAN's opinion, he observed, with evident agreement, that the intervening photographic and lineup identifications were "conceded to be suppressible fruits of the Fourth Amendment violation". *United States v Crews (supra,* p 472). When the varied opinions in *Crews* are considered in the light of *Ceccolini,* it is not difficult

to understand the basis on which the court sustained the in-court identification although in agreement with the trial court's suppression of the pretrial identifications.

The pretrial identifications were suppressed because they represented an exploitation of the Fourth Amendment violation that occurred when the defendant in *Crews* was unlawfully arrested. The in-court identification was found admissible on the basis of a quite separate principle, derived from the rule embodied in *Ker v Illinois* (119 US 436) and *Frisbie v Collins* (342 US 519) and most clearly set forth in the concurring opinion of Mr. Justice WHITE (at pp 478-479):

"We held in *Frisbie* v. *Collins, supra,* at 522, 'that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction' unlawfully. A holding that a defendant's face can be considered evidence suppressible for no reason other than that the defendant's presence in the courtroom is the fruit of an illegal arrest would be tantamount to holding that an illegal arrest effectively insulates one from conviction for any crime where an in-court identification is essential. Such a holding would be inconsistent with the underlying rationale of *Frisbie* from which we have not retreated. * * *

"The fact that respondent was present at trial and therefore capable of being identified by the victim is merely the inevitable result of the trial being held, which is permissible under *Frisbie,* despite respondent's unlawful arrest."

Mr. Justice POWELL explicitly agreed with this analysis in his separate concurring opinion. And although the opinion of Mr. Justice BRENNAN differed from the concurring opinions in giving significance to the fact that the defendant was suspected before the unlawful arrest (a qualification subscribed to by only three Justices of the court) his conclusion also rested significantly on the applicability of the *Ker—Frisbie* doctrine. (See p 474, and n 20.)

It is an obvious and serious error to regard the opinions in *Crews* as in any way standing for the proposition that the exclusionary rule does not apply to the testimony of live witnesses derived from a Fourth Amendment violation. As already seen, the applicability of the exclusionary rule to such testimony had been clearly affirmed by the Supreme Court in *United States v Ceccolini (supra),* and there is no intimation in *Crews* of a disposition to depart in any respect from that principle. The decision in *Crews* rests explicitly on the limited

ground, derived from the *Ker—Frisbie* line of cases, that inherent in the jurisdiction of a court to try a defendant unlawfully arrested is the right of a witness, whose testimony is otherwise untainted, to come to court and identify such a defendant at trial.

In the light of these authorities, the immediate issue presented with regard to the pretrial identifications is whether, in the classic formulation of the United States Supreme Court in *Wong Sun v United States* (371 US 471, 488) "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

The relevant facts are few. In the aftermath of the robbery that occurred in Bronx County on October 4, 1976, an alarm was issued with the serial number of a gun stolen during its commission. The defendant and others were arrested by Suffolk County police officers on December 17, 1976, in possession of that gun and other weapons in a police action later determined judicially to be unlawful and resulting in the suppression of the seized weapons. The Suffolk County police communicated the fact of the seizure of the gun and the identity of the arrested persons (including the defendant) to the police officers in charge of the robbery investigation. A photographic folder including a picture of this defendant taken from police files was exhibited to the victims of the robbery and he was identified as a participant. This was followed shortly thereafter by a lineup identification.

The hearing minutes disclose no explanation for the several months delay that occurred before the folder was submitted to the victim. The most reasonable inference is that the delay was occasioned by the preoccupation of the investigating officers with other criminal investigations. In any event, the record is clear that no photographs were exhibited to the victims between the date the information concerning the Suffolk County arrest was received and the photographic identification described above.

Nothing in these events supports the conclusion that the challenged evidence was derived "by means sufficiently distinguishable to be purged of the primary taint." *(Wong Sun v United States, supra,* p 488.) Nor does the requirement set forth in *Ceccolini* (435 US 268, 278, *supra)* of "a closer, more direct link between the illegality" and live-witness testimony indicate a different result under these facts.

The facts here do not remotely approach the totality of circumstances that led the Supreme Court in *Ceccolini* to find attenuation, notwithstanding the strenuous effort in the opinion of this court to suggest a parallel.

Nor do I find at all persuasive the argument that attenuation occurred because the defendant's picture used in the photographic display was already in the police files and so "untainted." It makes little sense to say that the fortuitous presence of that photograph attenuates the connection between the Fourth Amendment violation and the defendant's identification, although such attenuation presumably would not have occurred if the witness, without the intervening photographic identification, had identified the defendant directly in a lineup. The reliance in this connection on *Bynum v United States* (274 F2d 767, cert den 379 US 908) is wholly misplaced, as is clearly disclosed by an examination of the underlying facts in the first *Bynum* opinion (262 F2d 465). Bynum had been arrested without probable cause and fingerprinted after he had been identified as a suspect in the robbery for which he was ultimately convicted. The court held in substance that fingerprints taken during the period of unlawful detention were not admissible in evidence but that other fingerprints in the possession of the authorities were properly admitted. The relevance of this authority to the issue here eludes me.

Notwithstanding the foregoing, I fully share with the court a sense of disquiet at the application of the exclusionary rule to live-witness testimony where a defendant's connection with a crime was discovered as an accidental by-product of police action in another county later determined to constitute a Fourth Amendment violation. This court's opinion is entirely sound in the view that the deterrent effect of the exclusionary rule here is minimal in relation to its far-reaching impact on criminal law enforcement. A question of large importance is presented.

Where a defendant's connection with a crime is discovered through a Fourth Amendment violation, the application of the exclusionary rule to live-witness testimony has more far-reaching consequences than where, as in *Ceccolini*, the violation results in the discovery of a particular witness. The practical effect may be to confer on the defendant immunity from prosecution.

The potential significance of the issue is underlined when it

is considered that the ground assigned in *Crews* for permitting the in-court identification, which relied on the *Ker—Frisbie* principle that a court has jurisdiction to try an unlawfully arrested defendant, may not be available where the Fourth Amendment violation is unrelated to an unlawful arrest. Thus, the possibility is presented that an unjustified police intrusion into a person's home, office or vehicle, which unexpectedly discloses evidence linking the defendant with a host of major crimes, may result in a sweeping grant of immunity from prosecution. Where the police action, as here, is wholly unrelated to the crimes in question and the discovery of the evidence unexpected, the consequences of applying the exclusionary rule to resulting live-witness testimony are extremely disturbing and difficult to justify.

Accordingly, I think it would make sense to exempt from the exclusionary rule live-witness testimony where a defendant's connection with a crime or crimes is the unexpected by-product of a Fourth Amendment violation in the course of a wholly separate investigation. However, I am aware of no present authority that sanctions such a limitation.

To the extent to which *Crews* speaks to the issue, it would appear to suggest the contrary. The opinion of Justice BRENNAN clearly discloses that at least three Justices of the Supreme Court were influenced, at least in part, to sanction the in-court identification because of the circumstance that the defendant was already a suspect before the unlawful arrest occurred. The approach taken in the concurring opinions did not require the other Justices to address this question. But nothing in *Crews* as a whole, or in any other authority called to my attention, supports the kind of limitation on the exclusionary rule that would seem to me the only possible basis for sustaining the result reached by this court.

One circumstance in this case presents an issue not resolved by the Supreme Court in *Crews.* The several opinions were phrased in terms of the right of a witness to make an in-court identification of a defendant notwithstanding the claim that the defendant had been arrested unlawfully. Not before the Supreme Court, and thus not squarely addressed, was whether the same principle would apply where, in addition to the defendant's unlawful arrest, physical evidence had been unlawfully seized which led directly to defendant's identification.

In a footnote on page 479, Mr. Justice WHITE expressed his disagreement with what he perceived to be an implication in a

part of Mr. Justice BRENNAN's opinion supported by a majority of the court that a different result would have followed in *Crews* if there had been a separate Fourth Amendment violation. Whether or not Mr. Justice BRENNAN intended to imply such a view, there can be no doubt that the reliance on the *Ker—Frisbie* doctrine in each of the opinions in *Crews* leaves unresolved the rule to be applied where the defendant relies on a Fourth Amendment violation other than one involving an unlawful arrest.

In this case, however, the seizure of the gun was incident to the defendant's unlawful arrest. Believing that the policy underlying the *Ker—Frisbie* principle, as developed in *Crews*, reasonably applies to this situation, I agree that the defendant's motion to suppress his in-court identification should be denied.

For reasons previously stated at length, I believe that defendant's motion should be granted to the extent that it seeks to suppress the pretrial identifications.

BIRNS, J. P., SULLIVAN and SILVERMAN, JJ., concur with ROSS, J.; SANDLER, J., dissents in part in an opinion.

Order, Supreme Court, Bronx County, entered on October 19, 1979, reversed, on the law, and defendant's motion denied.