# DWIGHT LAMONT ROBINSON *v.* STATE OF MARYLAND

[No. 365, September Term, 1982.]

*Decided December 8, 1982.*

The cause was argued before MORTON, LOWE and WILNER, JJ.

*Mark Colvin, Assigned Public Defender,* for appellant.

*Jillyn K. Schulze, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Marjorie L. Clagett, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

On the afternoon of April 18, 1981, two men entered the office of the Automotive Moving Center in Prince George's County and, at gunpoint, helped themselves to money from the company's cash register and from the wallets of two employees, Joseph Foster and Donald Beauchert. On May 5, 1981, appellant was arrested in connection with another incident, and, as a consequence of that arrest, was routinely photographed. A month later that photograph was shown, as part of an array, to the two employee-victims of the April robbery. One of the employees — Mr. Foster — identified appellant from that array, whereupon appellant was arrested and charged with the armed robbery and various associated offenses.

Appellant was tried before a jury in the Circuit Court for Prince George's County and convicted of two counts (each) of robbery with a deadly weapon, theft, and use of a handgun in the commission of a crime of violence. From those convictions and the twenty-five year prison sentence imposed

thereon, he brings this appeal raising seven issues. We shall address two of them:

(1) "Did the trial court err in allowing the prosecutor to question Appellant regarding the details of a prior conviction"; and

(2) "Did the trial court err in summarily rejecting Appellant's contention that any identification of him by Foster should be suppressed as the fruit of an unlawful arrest?"

The first of these we think must be answered in the affirmative. The court erred in permitting, over forceful objection, an extensive and unwarranted cross-examination regarding the circumstances of another crime of which appellant had been convicted. The error was of sufficient magnitude and prejudice as to require that we reverse the judgments and remand for a new trial. All but one of appellant's other complaints involve events occurring at his trial and are resolved by our reversal. The exception is the second issue noted above; that likely will surface again at retrial, as it involves the admissibility of evidence that the State apparently thinks is important.

## (1) Cross-Examination Regarding Prior Conviction

Appellant testified in his own behalf. His defense was that of alibi; he claimed that on the day of the robbery he was at his father's home from ten in the morning to five in the evening.[1]

Cross-examination was extensive. It ended with this colloquy:

"Q [By prosecuting attorney] And you were in fact convicted on December 9, 1977 in the Circuit Court for Prince George's County in Criminal

---

1. Three other defense witnesses gave testimony corroborating that alibi.

Trials 18207 of daytime housebreaking, is that correct?

A [By appellant] Say that again, ma'am.

Q You were convicted on December 9, 1977, Circuit Court, Prince George's County, Criminal Trials 18207 for daytime housebreaking, is that correct?

A Yes, ma'am."

On redirect, defense counsel pursued the matter thusly:

"Q Mr. Robinson, when you were convicted in November, 1977, did you plead guilty?

A Yes, sir.

Q Were you guilty?

A Yes, sir.

Q Were you offered a chance to plead guilty to a less[e]r count *in this case?*

A Yes.

Q Did you refuse to take that plea?

A Yes, sir.

MRS. CLAGETT [Prosecuting Attorney]: I'm going to object.

THE COURT: *Sustained.*" (Emphasis supplied.)

On recross, the prosecutor returned to the subject again. This is what happened:

"Q Mr. Robinson, isn't it a fact the reason you pled guilty in Criminal Trials 18207 was the fact that you broke into a woman's home, took two fur coats and you were caught red-handed in that case, weren't you?

MR. NEAL [Defense Attorney]: Objection.

THE COURT: Overruled.

THE WITNESS: No, ma'am.

BY MRS. CLAGETT:

Q You were not caught red-handed?

A No, ma'am.

Q   Not caught as the security guard caught you as you came out?

MR. NEAL: May I approach the bench?

THE COURT: Come on up.

(Whereupon, counsel approached the bench, and and [sic] the following ensued:)

MR. NEAL: Your Honor, Mrs. Clagett has been State's Attorney long enough to know you cannot go into facts of a conviction.

THE COURT: *You've been a State's Attorney long enough not to ask a question about didn't you plead guilty because you got a deal.*

*All right, let's go, you opened the door.*

MR. NEAL: *That was not my question, move for a mistrial. You made that statement so the jury can hear it.*

THE COURT: Let's go.

MR. NEAL: Move for a mistrial.

THE COURT: It's denied.

(Whereupon, counsel returned to their respective trial tables.)

THE COURT: What was the question, Mrs. Clagett?

MRS. CLAGETT: I think it was isn't it a fact as you were leaving, you and a buddy —

MR. NEAL: Objection to any facts, Your Honor.

THE COURT: What was that?

MR. NEAL: I object to any facts about a case that he pled guilty to.

THE COURT: That is overruled. Read the question back before there was an objection.

MRS. CLAGETT: The question was Mr. Robinson, you were not caught by the security guard as you were leaving with these two fur coats?

MR. NEAL: Objection.

THE WITNESS: No, ma'am.

THE COURT: That is overruled.

BY MRS. CLAGETT:

Q   In fact, as you were leaving that apartment he tried to subdue you and you ran away, is that right?

MR. NEAL: Objection.

THE COURT: That is overruled.

THE WITNESS: From security?

BY MRS. CLAGETT:

Q   Yes.

A   (No response.)

Q   You want me to repeat the question?

A   Security guard chased me?

Q   Yes.

A   Not that I know.

Q   Emery Griffeth?

A   I don't know.

Q   In that case you also confessed to the crime, did you not?

A   No.

Q   You didn't confess to the crime?

MR. NEAL: Objection.

THE COURT: Overruled.

THE WITNESS: No.

MR. NEAL: I don't know who these people she is calling out are, Your Honor. I object to the whole line of questioning.

THE COURT: Overruled.

Come up, please.

(Whereupon, counsel approached the bench, and the following ensued:)

THE COURT: I indicated to you before, just make an objection, I'll make a ruling. Don't say anything after the objection. Now go back and sit down.

MR. NEAL: Your Honor asked us to approach the

bench and refused to grant me access. Asked for discovery, now going into the facts of the case, four years ago; I don't have these people. I haven't cross-examined them. I have no way of knowing what happened in that case except he pled guilty, that was supplied.

I just want to put my reasons. I don't mean to be argumentative.

THE COURT: You're a very experienced attorney. You were a Deputy State's Attorney in this county. You knew very well the question you asked on redirect was highly improper and you opened up the door. And I'm going to let her ask anything about why he pled guilty in this previous offense based on the question that you have asked.

Now go back and sit down.

(Whereupon, counsel returned to their respective trial tables.)

BY MRS. CLAGETT:

Q Now, Mr. Robinson, your nickname is Pee-Wee, isn't it?

A Yes, ma'am.

Q Now, again I ask you, in the breaking and entering you pled guilty to, this is the house of Daisey Buggs, June 1st, 1977, were you not in fact stopped by security when you escaped with two fur coats?

MR. NEAL: Objection.

THE COURT: Just a moment. He's answered that question, Mrs. Clagett, ask him another question.

MRS. CLAGETT: Court's indulgence.

BY MRS. CLAGETT:

Q And specifically, didn't you give a verbal confession to the investigating officer in that case?

MR. NEAL: Objection.

THE COURT: Overruled.

THE WITNESS: I don't know.

MRS. CLAGETT: You don't know. You learned not to do that, didn't you?

THE COURT: Just a minute, please. Just ask him a question, Mrs. Clagett, please.

MRS. CLAGETT: I have no other questions, Your Honor." (Emphasis supplied.)

The law is clear on this point. Md. Code Ann., Courts Article, § 10-905 (a) provides that "[e]vidence is admissible to prove the interest of a witness in any proceeding, or *the fact of his conviction* of an infamous crime." (Emphasis supplied.) In *Huber v. State,* 2 Md. App. 245, 257 (1967), we held that "the proper interpretation of [that provision] would permit only the fact of conviction for a specific crime to be permitted [*sic,* admitted] into evidence, and not the details of *the commission of the crime.*" (Emphasis supplied.) We noted that:

> "When the details of the commission of a prior crime by a witness are introduced into evidence, there is a danger that the jury may be misled into a conviction by evidence of an offense for which the defendant is not indicted. . . and hence the introduction of such evidence should be subject to rigid scrutiny by the court. . . ."

*Id. See also Kable v. State,* 17 Md. App. 16, 31, *cert. den.* 268 Md. 750 (1973). More recently, the Court of Appeals observed in *Ricketts v. State,* 291 Md. 701, 703 (1981), "[t]he evidentiary tool the State customarily uses to attack the defendant's credibility is evidence of his prior convictions. *The only details ordinarily allowed to be presented to the jury are the nature of the charge and the fact of conviction.*" (Emphasis supplied.)

The questions allowed here obviously extended far beyond the nature of the charge and the fact of conviction. They included not only the "details of the commission of the crime," but the attempt at flight and an extra-judicial confession.

The trial judge allowed this line of inquiry on the ground

that defense counsel had "opened the door" by asking whether appellant had pled guilty "because [he] got a deal." It would seem from this that, although not very well articulated, the court, in effect, was applying the doctrine of "curative admissibility," a doctrine which, under some circumstances, permits a party to offer otherwise inadmissible evidence in response to like evidence offered by his adversary. *See,* in general, 1 Wigmore, *Evidence,* § 15 (3d ed. 1940); *McCormick on Evidence* 2d, § 57; 29 Am. Jur. 2d, *Evidence,* § 267.

We are aware of but two instances in which this doctrine has been considered in the context now before us, both times by the District of Columbia Court of Appeals. *See Jenkins v. United States,* 374 A.2d 581 (D. C.), *cert. den.* 434 U.S. 894 (1977); and *Middleton v. United States,* 401 A.2d 109 (D.C. 1979). As expounded in *Middleton,* the theory proceeds thusly: (1) it is permissible for the State to attack a testifying defendant's credibility by showing prior convictions; (2) it is also permissible for a defendant "to give a limited explanation of extrinsic convictions when the subject is first broached by the government" (401 A.2d at 125); (3) it is *not* permissible, however, for a defendant to contrast a guilty plea in a prior case with his defense of the instant case, for that bears not on his credibility but rather tends "to create an inference of innocence with respect to the charges in the present case" *(id.,* 125); and (4) if the defendant nevertheless injects that into the case, he has "opened the door" to the State also using otherwise inadmissible evidence regarding the prior offenses in order to respond to the impermissible inference that he is innocent in this case.

The doctrine of curative admissibility, in this context, has not previously been accepted in Maryland; and we have some difficulty with it, especially in this case. We note, first, that the court was plainly wrong in its interpretation of appellant's testimony on redirect examination. Appellant did *not,* as the court seemed to believe, indicate that he had pled guilty in the earlier case "because [he] got a deal." His testimony on redirect neither mentioned nor suggested any

kind of "deal" with regard to the earlier case. Appellant said that he pled guilty and that he *was* guilty; and that was all that he said on that subject. The question on redirect regarding a "deal" pertained to the *instant* charge, not the 1977 conviction; *and the court sustained the State's objection to it, thus removing the matter from the jury's consideration.* In that circumstance, the doctrine of curative admissibility has no application. No door was opened; there was simply nothing to respond to.

Even when applicable, the doctrine must be used with great caution. The *Middleton* Court itself recognized "that the doctrine of curative admissibility is 'dangerously prone to overuse' " and that it should be applied " 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.' " 401 A.2d at 127. McCormick expresses a similar view (*see* McCormick, *supra,* § 57), as does Wigmore in what he calls the "Massachusetts rule": "The opponent may reply with similar [inadmissible] evidence *whenever it is needed for removing an unfair prejudice which might otherwise have ensued from the original evidence,* but in no other case." (Emphasis in original; *see* Wigmore, *supra,* § 15.)

We fail to see any such unfair prejudice in this case sufficient to justify the State's far-ranging inquiry. In the first place, aside from the obvious (and no doubt intended) prejudicial side effect to appellant, all that the State's recross examination did was to confirm what appellant had already conceded — that he was, in fact, guilty in the earlier case, and that he had pled guilty. It added nothing of substance to the instant case and did nothing to impeach the truthfulness of appellant's concession. Second, the massive response permitted here served only to inject into the case a colossal irrelevancy. Appellant was required to respond to details of another case which had nothing whatever to do with any issue properly before the jury. It was, at best, a grossly improper distraction. In all, this was hardly the "rigid scrutiny" of which we spoke in *Huber, supra.*

## (2) Photographic Identification

Appellant moved, pretrial, to suppress all extra-judicial and in-court identification evidence "[r]esulting from an illegal arrest or search and seizure." The motion did not aver that there had in fact been an illegal arrest, search, or seizure or that there was in fact any identification evidence obtained from such an arrest, search, or seizure.

At the hearing held on the suppression motion, it developed that the photograph of appellant included in the array shown to Messrs. Foster and Beuchert on June 5, 1981, had been taken on May 5, 1981, following appellant's arrest in connection with the other incident. Detective Price, who had assembled the array and shown it to Foster, stated that he was not present when that arrest occurred. This colloquy then took place:

> "Q [By Defense Attorney] You did not person-ally know the circumstances of that arrest, detective?
>
> MRS. CLAGETT: Objection.
>
> THE COURT: Mr. Neal, ask him another question.
>
> MR. NEAL: My proffer is there was an illegal arrest —
>
> THE COURT: He has already testified under oath there was no arrest made in this U-Haul case as of the time that he showed Mr. Foster the pictures.
>
> Now, what he was arrested for somewhere else doesn't make the least bit of difference to me in ruling on this motion.
>
> MR. NEAL: My proffer would be if he were illegally arrested, then the photograph would be fruits of the poisonous tree.
>
> THE COURT: Mr. Neal, just ask him another question.
>
> MR. NEAL: I have no other questions."

Appellant offered no evidence regarding the photograph or (with respect to that aspect of his motion) regarding the May arrest [2] and the motion was thereupon denied. At trial, the six photographs in the array were admitted into evidence along with testimony regarding Foster's selection of appellant's photograph. In addition, Officer Coccaro, who had arrested appellant on May 5, testified in detail as to the circumstances of that arrest.

Citing *United States v. Crews,* 445 U.S. 463 (1980), *Washington v. State,* 293 Md. 465 (1982), and *Baker v. State,* 39 Md. App. 133 (1978), appellant argues that he was entitled, at the suppression hearing, to inquire into the validity of his May 5 arrest, on the ground that, if that arrest was unlawful, the photograph taken of him would be subject to suppression as tainted fruit from a poisonous tree.

*Crews,* by the time it reached the Supreme Court, involved the question of whether the "fruit of the poisonous tree" doctrine enunciated in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385 (1920), and *Wong Sun v. United States,* 371 U.S. 471 (1963) applied to an *in-court* identification. The facts, briefly, were as follows:

Between January 3 and January 6, 1974, three women reported being robbed while in the restroom at the Washington Monument. Each of them described her assailant to the police. On January 9, the police noticed Crews, who fit the description given by the victims, meandering around the restroom area of the Monument. Upon request, he identified himself, said that he was sixteen, and admitted that he had "walked away from school." Their suspicion aroused, the police detained Crews for about ten minutes and attempted to take a Polaroid photograph of him; but because of inclement weather they were unable to

---

2. Appellant was arrested while a passenger in a stolen car, in which a shotgun and a handgun were discovered. His suppression motion also included the shotgun recovered from the car; and, with regard to that aspect of the motion, he testified that he was merely a passenger in the car and did not know it had been stolen. That testimony was directed solely at the issue of "standing" to complain about the seizure, and did not directly touch upon the validity of the arrest.

produce a picture suitable for display to the robbery victims. He was then taken into custody as a suspected truant and removed to the police station where he was photographed, questioned, and, after about an hour, released.

Crews was never formally arrested or charged with any offense arising from that encounter. It was clear that the whole purpose of his detention was to obtain a usable photograph that could then be shown to the three robbery victims. The photograph was indeed used for that purpose. It was presented, as part of an array, to the three women, each of whom identified Crews as the robber. The three victims subsequently identified Crews in a line-up and at trial.

Finding that the police had no probable cause to detain Crews on January 9, the trial court suppressed the photograph taken of him that day (and the subsequent line-up identification). It found an "independent source" for the in-court identifications, however, and thus ruled them to be admissible. *That* was the issue presented to the D. C. Court of Appeals (*Crews v. United States,* 389 A.2d 277 (1978)) and ultimately to the Supreme Court. At the appellate level, the Government conceded the inadmissibility of the photograph, and the correctness of its suppression was therefore not an issue in those proceedings.

The Supreme Court held that the unlawful arrest did not taint the in-court identification. The identities of the defendant and the three witnesses were known prior to any misconduct, said the Court; moreover, the record indicated that the judicial identifications rested not on the photographs but on the victims' independent recollections of what had occurred.

We may suppose from what was *said* in *Crews,* if not from what was actually decided, that, in the circumstances evident there, the Government's concession regarding the photograph taken at the police station was a sage one. *Cf. Washington v. State, supra,* 293 Md. 465, 472. Clearly, that photograph was the unattenuated offspring of an illicit intercourse between Crews and the police. It was inadmissible not because of what was determined in *Crews* itself, but

because it fell squarely within the traditional concept of fruit that not only came from a poisonous tree but was itself a bit sour.

There is a major difference here. Whether appellant's warrantless arrest on May 5 was legal or illegal, it had absolutely nothing whatever to do with this case. Unlike the situation in *Crews,* there was not even a suggestion here, much less a proffer of evidence, that appellant was arrested (or photographed) as a pretext for gathering evidence in this case. *Compare also Davis v. Mississippi,* 394 U.S. 721 (1969). Indeed, an entire month elapsed before the photograph was even shown to Foster and Beuchert.

The Supreme Court made clear in *Wong Sun, supra,* 371 U.S. at 487-88, that not all evidence "is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Rather, it said, "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " This concept has been otherwise expressed as one of "attenuation" — is the connection between the lawless police conduct (the tree) and the evidence obtained as a result of it (the fruit) so "attenuated" as to dissipate the taint that otherwise would flow from the tree to the fruit?

In *Baker v. State, supra,* 39 Md.App. 133, we noted that the Supreme Court had adopted a balancing test in applying the "fruit of the poisonous tree" doctrine. At p. 140:

> "The Court, in *Stone v. Powell,* 428 U.S. 465. . . said that '[t]he primary justification for the exclusionary rule. . . is the deterrence of police conduct that violates Fourth Amendment rights.' . . . The deterrent effect of the exclusionary rule must be weighed against the harm which society suffers when the particular evidence. cannot be used in a judicial proceeding. Thus, '[t]he application of the rule has .been restricted to those areas where its

remedial objectives are thought most efficaciously served.' *United States v. Calandra,* 414 U.S. 338, 348. . . ."

Most courts, when faced with a situation such as that presented here, have either expressly or tacitly applied this kind of balancing approach and have regarded the fruit as sufficiently untainted to be edible by the trier of fact. The clearest exposition of this was by Justice Mosk in *People v. McInnis,* 494 P.2d 690 (Cal.), *cert. den.* 409 U.S. 1061 (1972). There, as here, the defendant was initially identified by an armed robbery victim through a photograph routinely taken as the result of another arrest. There, as here, he claimed that that arrest was illegal and thus sought to suppress the photograph. Rejecting his claim, the Court held, at p. 693:

"To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are 'fruits of the poisonous tree' would not merely permit the criminal 'to go free because the constable has blundered' . . . but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested: if the photograph of a person obtained because of such an arrest becomes instrumental in the identification of that person for a crime committed many years later, it could be urged that *but for* the old illegal arrest the criminal would not have been identified. Rationally, however, a 'but for' relationship alone is insufficient to render the photograph inadmissible since it cannot be said that many years later the illegality of the earlier arrest was being 'exploited.' . . . .

In the case at bar, while the time span between the illegal arrest and the robbery was not one of years but only a month, nevertheless the principle remains the same, and there is no evidence

whatever of exploitation." (Emphasis in the original.)

See also *People v. Price,* 394 N.E.2d 1256, 1264-65 (Ill.App. 1979); *United States v. Haynie,* 637 F.2d 227, 238 (4th Cir. 1980), *cert. den.* 451 U.S. 972, 988 (1981); *United States ex rel. Moore v. Lane,* 612 F.2d 1046 (7th Cir. 1980); *People v. Pleasant,* 430 N.Y.S.2d 592 (A.D. 1980), *aff'd* 446 N.Y.S.2d 29 (1981); *State v. Hacker,* 627 P.2d 11 (Or.App. 1981); *Taylor v. State,* 547 P.2d 674 (Nev. 1976); *Simmons v. United States,* 364 A.2d 813 (D.C. 1976); *People v. Pettis,* 298 N.E.2d 372 (Ill.App. 1973); *People v. Shaver,* 396 N.E.2d 643 (Ill. App. 1979); *People v. Griffin,* 59 Cal. App. 3d 532 (1976); and *cf. State v. Matera,* 401 So.2d 1361 (Fla. App. 1981). *Compare, however, People v. Teresinski,* 640 P.2d 753 (Cal. 1982).[3]

We think that the approach taken in these cases is the correct one, whether expressed as "attenuation" or simply as a rational and commonsense application of the "fruit of the poisonous tree" doctrine. In the absence of evidence (or a reasonably firm and detailed proffer of evidence) tending to show that appellant's May 5 arrest was not only illegal but was merely a pretext for a general exploratory search (as in *Davis v. Mississippi, supra)* or for gathering evidence in this case (as in *United States . v. Crews, supra),* a routine "booking" photograph taken as a consequence of that arrest would not be suppressible as tainted fruit in this proceeding. Accordingly, the legality or illegality of the May 5 arrest, standing alone, was quite irrelevant to the suppression

---

3. In *Teresinski,* the defendant was stopped in his automobile, purportedly on the ground that he was a juvenile and was in violation of a juvenile curfew law. The detention, if not the initial stop, was unlawful. The officer searched the car, found certain evidence traceable to an earlier robbery of a grocery store, and arrested the defendant *for that robbery.* He was "booked" and photographed. The photograph was then promptly shown to the robbery victim, who identified the defendant from it. The Court held, at p. 758: "Since defendant was booked and photographed following that detention *as part of the investigation of the Seven-Eleven robbery,* the robbery victim's identification of defendant's booking photograph — *a photograph taken as a direct and immediate result of that illegality* — is also inadmissible." (Emphasis supplied.)

issue, and the court therefore committed no error in foreclosing an inquiry into it.

> *Judgments reversed; case remanded for new trial; Prince George's County to pay the costs.*