[No. B109477. Second Dist., Div. Seven. May 26, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN THIERRY, Defendant and Appellant.

## COUNSEL

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka, and Arthur H. Auerbach, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Upon denial of his motion to suppress, appellant pleaded nolo contendere to one count of robbery in violation of Penal Code section 211 and on a special allegation pursuant to Penal Code section 12022.5, subdivision (a). The sole issue on appeal is whether the trial court erred in denying appellant's motion to suppress any photographs taken of appellant and any identifications made with those photographs following a purported illegal arrest. We conclude the taking of appellant's photograph was reasonable involving no exploitation of the alleged illegal arrest. We therefore affirm the judgment.

### FACTS AND PROCEEDINGS BELOW

On November 29, 1995, Officer Jennifer Hickman of the Los Angeles Police Department was patrolling the area of Cadillac and Chariton in the City of Los Angeles. Detective Stanley Evans had informed Officer Hickman that appellant was wanted for robbery and he frequented the area of Garth and Cadillac. Officer Hickman observed appellant on the west side of Garth Street, just north of Cadillac, and took him into custody.

Detective Evans was assigned to the investigation of multiple robberies in a five-block radius, including the robbery of Rashawn Tony ( Mr. Tony). As part of the investigation of the robberies, Detective Evens spoke with Mr. Tony. Mr. Tony told Detective Evans that Dominique Gist (Gist) was the

person who robbed him. Gist was arrested and later interviewed by Detective Evans. Gist gave Detective Evans appellant's nickname and address and told Detective Evans appellant robbed Mr. Tony and also was involved in robberies at the gas station at La Cienega and Cadillac.[1] Detective Evans ran the description of the suspect to the robberies through the computer. This very general description was consistent with appellant's general description. The officers arrested appellant for the robbery of Mr. Tony based on the information Gist gave to Detective Evans.

The day after appellant's arrest Detective Evans took appellant's picture. Detective Evans used this photo in a photographic lineup shown to Mr. Tony. Mr. Tony stated he knew appellant and appellant was not the person who robbed him. Detective Evans then showed the same photographic lineup to victims of other robberies. Charles Negethe and Manuel Ceja identified appellant as the perpetrator in their robberies.

Appellant was charged with six counts of robbery and two counts of attempted robbery, none of them involving the Tony robbery for which he was initially arrested. After the trial court denied appellant's Penal Code section 1538.5 motion to suppress any photographs taken of appellant after his arrest and any identifications made with those photographs, appellant pled nolo contendre to a violation of Penal Code section 211 and on a special allegation pursuant to Penal Code section 12022.5, subdivision (a). The trial court sentenced appellant to the low term of 2 years for the Penal Code section 211 violation and the high term of 10 years on the special allegation for a total sentence of 12 years.

## DISCUSSION

Appellant contends the trial court erred in denying his motion to suppress any photographs taken of him after his arrest in the Tony case and also any identifications made with those photographs. He contends Gist's statements and Detective Evans's corroboration were insufficient to establish probable cause to arrest him for the Tony robbery. We find it unnecessary to address appellant's probable cause argument, which indeed presents a close question. Even if that initial arrest violated appellant's Fourth Amendment rights, we conclude the identification evidence remains admissible against appellant in prosecutions for other crimes, such as the one to which he pled nolo contendere in this proceeding.

---

[1] The record is not clear as to when Gist gave Detective Evans the information implicating appellant in the gas station robberies. However, this uncertainty does not affect our decision.

## I. *The "Fruit of the Poisonous Tree" Doctrine Does Not Require Suppression of Photo Identifications Based on Photographs Which Happen to Have Been Taken While a Defendant Was in Custody Under an Illegal Arrest.*

Appellant argues the identification evidence linking him to these other robberies must be excluded because they were the "fruit of the poisonous tree." According to this theory, the officers took photographs of him as a result of the arrest for the Tony robbery and then used those photographs to obtain identifications linking him to the other robberies. The Mr. Tony arrest was the "poisonous tree" and the photographs the first fruits and the victim's photo identifications the second crop of fruit from that infected tree.

█ In determining whether evidence is the "fruit of the poisonous tree" and therefore inadmissible the correct inquiry is " ' "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " (*Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023]; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [83 S.Ct. 407, 417-418, 9 L.Ed.2d 441], quoting Maguire, Evidence of Guilt (1959) p. 221.)

There are three recognized avenues for admitting the "fruit of a poisonous tree" despite its illegal origins: (1) The same evidence was discovered through an *independent source* not tainted by the poisonous tree. (2) The evidence was not found through a second untainted source but it should not be suppressed despite law enforcement's illegal acts because the same evidence would have been *inevitably discovered* through legal means. (The inevitable discovery rule is "a variation upon the ' "independent source" ' theory, 'but it differs in that the question is not whether the police did in fact acquire certain evidence by reliance upon an untainted source but instead whether evidence found because of a Fourth Amendment violation would inevitably have been discovered lawfully.' [Citations.]" (*People* v. *Saam* (1980) 106 Cal.App.3d 789, 797 [165 Cal.Rptr. 256]).) (3) The connection between the illegal source and the evidence is so *attenuated* it would serve no legitimate purpose to suppress the evidence. (See 5 LaFave, Search and Seizure (1996) § 11.4, pp. 234-253.)

█ In *People* v. *McInnis* (1972) 6 Cal.3d 821 [100 Cal.Rptr. 618, 494 P.2d 690], the California Supreme Court applied the "fruit of the poisonous tree" doctrine to the admissibility of photographs taken while a defendant is under an illegal arrest. In *McInnis*, a store clerk and a pedestrian witnessed the defendant committing a liquor store robbery. Police officers later arrested and photographed defendant for an unrelated crime. The officers

showed this photograph to the witnesses from the liquor store robbery. From the photograph, they identified the defendant as the perpetrator of the robbery. The trial court refused to suppress the photograph despite the possible illegality of the arrest which resulted in the taking of that photograph.

In affirming the judgment the Supreme Court majority reasoned the taking of a booking photograph was "standard police procedure [citation], bearing no relationship to the purpose or validity of the arrest or detention. . . . [T]he photos are kept in permanent files regardless of the eventual disposition of the case; indeed, thousands of persons ultimately found to be entirely innocent undoubtedly have their photographs . . . on record with law enforcement agencies." (6 Cal.3d at pp. 825-826.)

The *McInnis* majority opinion analogizes to the high court's earlier opinion in *Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 170 [89 Cal.Rptr. 731, 474 P.2d 683], where the court found the connection between an illegal arrest and the present crime was "pure happenstance." In *Lockridge*, the Pesce robbery remained unsolved until officers served an unlawful search warrant during the course of investigating crimes totally unrelated to the robbery. During that search, they discovered the Pesces' gun in the defendants' possession. In a later trial of the Pesce robbery case, the trial court suppressed the gun but allowed the Pesces to testify. This was not a case fitting easily the "independent source" or "inevitable discovery" rationales. Without the lead supplied by the gun found during the illegal search it seems improbable the police investigation would have connected the defendants with the Pesce robbery. So in that sense the prosecution of defendants for that crime and some of the evidence introduced against them was the "fruit of the poisonous tree."

"Nevertheless," the Supreme Court held, ". . . we do not believe that the police connection of petitioners to the Pesce robbery through the illegal discovery of the gun is sufficient to characterize the Pesces' testimony as 'come at by exploitation of that illegality.' " (*Lockridge* v. *Superior Court*, *supra*, 3 Cal.3d at p. 170, citing *Wong Sun* v. *United States*, *supra*, 371 U.S. 471, 488 [83 S.Ct. 407, 417-418].) The court reasoned ". . . it was pure happenstance that during the investigation of other crimes, the police came across the gun taken in the Pesce robbery." (*Lockridge*, at p. 171.)

" '[P]ure happenstance' as used in *McInnis* and *Lockridge*, [has been defined as] a chance disclosure absent 'the exploitation of illegal police conduct . . . .' " (*People* v. *Griffin* (1976) 59 Cal.App.3d 532, 537 [130 Cal.Rptr. 648].)

The present case resembles *McInnis*. A photograph of appellant originally taken as a result of (or at least while he was in custody for) a purported illegal arrest led to his connection with the crimes currently charged. As in *McInnis*, the illegal arrest here was in no way related to the crimes with which appellant was ultimately charged.[2]

Other jurisdictions have found an illegal arrest does not render an identification—or even a photograph taken during the illegal arrest—inadmissible. Generally these opinions adopt the *McInnis* analysis or a variation thereof. (See, e.g., *United States* ex rel. *Moore* v. *Lane* (7th Cir. 1980) 612 F.2d 1046; *State* v. *Tyrrell* (1990) 234 Neb. 901 [453 N.W.2d 104]; *People* v. *Pettis* (1973) 12 Ill.App.3d 123 [298 N.E.2d 372]; *Kinsey* v. *State* (Tex. App. 1982) 639 S.W.2d 486; *State* v. *Price* (1976) 27 Ariz.App. 673 [558 P.2d 701].)

*Robinson* v. *State* (1982) 53 Md.App. 297 [452 A.2d 1291] follows *McInnis* and cites numerous cases from other jurisdictions, but also adds to the analysis. "We think that the approach taken in these cases is the correct one, whether expressed as 'attenuation' or simply as a rational and common-sense application of the 'fruit of the poisonous tree' doctrine. In the absence of evidence (or a reasonably firm and detailed proffer of evidence) tending to show that appellant's . . . arrest was not only illegal but was merely a pretext for a general exploratory search (as in *Davis* v. *Mississippi* [(1969) 394 U.S. 721 [89 S.Ct. 1394, 22 L.Ed.2d 676]]) or for gathering evidence in this case (as in *United States* v. *Crews* [(1980) 445 U.S. 463 [100 S.Ct. 1244, 63 L.Ed.2d 537]]) a routine 'booking' photograph taken as a consequence of that arrest would not be suppressible as tainted fruit in this proceeding." (*Robinson* v. *State, supra*, 452 A.2d at p. 1299.)

In stressing the motive for—not just the illegality of—the arrest which produced the defendant's photo, the Maryland appellate court appears to focus on the policies behind the exclusionary rule. ■ The underlying purpose of that rule—to discourage government from violating citizens' rights to be free from unconstitutional searches and seizures—can be accomplished without barring identifications obtained through photos taken during illegal arrests. That is so even though it might be said the photos would not exist "but for" the arrest.

■ Generally, law enforcement officers do not make arrests, legal or illegal, in order to obtain photographs they can use to seek identifications from the victims of crimes. They have other much more important motives

---

[2]Appellant was never charged with the robbery of Mr. Tony. He was charged with totally unrelated robberies.

for those arrests—to get suspects off the street, to search them for physical evidence, and to interrogate them. The taking of photographs and finger-prints is merely an incidental event accompanying the arrest. And, indeed there is no need to arrest a suspect in order to take a photograph of him or her. Officers can surreptitiously photograph people on the street without arresting or detaining them in any way. So, it could be said the arrest is only incidental to the photograph just as the photograph is only an incident of the arrest. In that sense, the rationale for admitting photographs taken during illegal arrests partakes of the "inevitable discovery" as well as the "attenu-ation" limitations on the fruit of the poisonous tree doctrine.

This is not to say every photograph taken while a defendant is held under an illegal arrest can be used in seeking identifications in other cases. Professor LaFave cautions "[e]ven if it is thought that the fears expressed by the *McInnis* dissenters are overstated, and that consequently it is not neces-sary to bar all use of photographs taken incident to illegal arrests, courts should nonetheless be vigilant in determining in particular cases whether the photograph was come by as a consequence of an arrest made *for the purpose of adding defendant's picture* to the police mug books." (5 LaFave, Search and Seizure, *supra*, § 11.4(g), p. 322, italics added.) LaFave's admonition makes sense. If the courts were to sanction the practice of making illegal arrests for the specific purpose of collecting photographs to be used in future or ongoing investigations we would encourage an increase, perhaps dra-matic, in the frequency of unconstitutional conduct on the part of law enforcement. In those instances, the taking of the photographs supplies an important motive, perhaps the prime motive, for the illegal arrests. Accord-ingly, to protect constitutional rights, the underlying purpose of the exclu-sionary rule would dictate the courts bar the photographs and resulting identifications.[3]

The instant case does not raise this concern, however. Here the taking of appellant's photograph was a reasonable police procedure for which we can find no evidence whatsoever of exploitation. The officers did not arrest

---

[3]For a case in which the court found a photograph to have been discovered by the exploitation of illegal police conduct, see *People* v. *Rodriguez* (1993) 21 Cal.App.4th 232, 241 [26 Cal.Rptr.2d 660]. In that case the court concluded the police illegally arrested a defendant for the primary or sole purpose of taking a "gang book photograph" which was "obtained deliberately for use in future criminal investigations." This case is readily distin-guishable from *Rodriguez*. There is no evidence in the instant case suggesting the officers' primary motive for appellant's arrest in the Tony investigation was to take photographs they could add to a "mug book" or a "gang book." Instead as discussed above, the evidence supports the conclusion they arrested appellant because they thought he committed a specific crime, the Tony robbery. After the arrest they took the photo and sought an identification from the victim of that crime. Only then did the officers use it for the crimes involved in this appeal.

appellant "for the purpose of adding defendant's picture to the police mug books." Rather they arrested him because they believed, albeit on questionable evidence, that he might have robbed Mr. Tony. They merely used the occasion of appellant's arrest for that crime to take a photograph they would have been entitled to take on the street or elsewhere without an arrest. And furthermore they used the photograph initially to seek an identification from Mr. Tony, the victim in the crime for which they had arrested appellant, not merely to add it to a "mug book." Only after Mr. Tony told them appellant was not the one who robbed him did the officers use the same photograph to seek and obtain identifications in other crimes.

It would be unnecessary and indeed absurd to rule inadmissible all identifications victims might make in criminal investigations merely because the officers chose to use a defendant's photograph which happened to have been taken while appellant was held illegally for a different crime. Only when law enforcement makes illegal arrests for the sole or primary purpose of obtaining photographs they can use in ongoing or future investigations is there a constitutional justification to bar use of those photographs in identifying the perpetrators of crimes. As explained above, the photographs here were an event occurring during the arrest not the motive for the arrest. Thus, the officers properly used them in photo arrays shown to the victims of appellant's crimes.

## II. *Assuming the Photographs and Photo Identifications Were Fruit of the Poisonous Tree, the Victims' In-court Identifications Were Not Tainted by That Illegality.*

We also observe an alternate rationale exists for upholding the judgment in this case. Even where courts have found it unlawful to use a particular photo to identify the defendant they do not always conclude the photo identification tainted the victim's in-court identification of the defendant. For instance, in *United States* v. *Slater* (10th Cir. 1982) 692 F.2d 107 officers assembled an array of photos and showed it to witnesses. The array included a photograph of defendant taken after he had been arrested illegally. The witnesses identified his photo as the perpetrator and he was prosecuted. At trial and on appeal he argued the photograph of him used in an array was inadmissible because it was taken after an illegal arrest.

The 10th Circuit held any error in admitting the photograph and ensuing photo identifications was harmless because the witnesses also identified the defendant in person during the trial. The court reasoned the witnesses "had each actually seen the crime committed at close hand, . . . there was no identification of another person or failure to identify the defendant, and the

person who committed the crime made no attempt to conceal his face . . . [therefore] the in-court identifications of [the defendant] were independently valid and that if there was any error in the failure to suppress the photographic array it was harmless." (692 F.2d at p. 108.)

At the preliminary hearing in the present case four victims testified and positively identified appellant as the perpetrator. Each victim actually saw the crime committed at close hand, they did not fail to identify the defendant, and the perpetrator made no attempt to conceal his identity. Consequently, the victims' in-court identifications of appellant as the perpetrator would render harmless any error in refusing to suppress the photographic identifications. Futhermore, since appellant pled nolo contendere he is foreclosed from speculating what might have happened had the case gone to trial. He has surrendered any opportunity to argue the victims somehow would have been unable to identify him independent of the photographic evidence had there been such a trial even though they demonstrated an ability to do so during the preliminary hearing.

For both reasons expressed in this opinion, we find the trial court did not err in denying appellant's motion to suppress under Penal Code section 1538.5.

### DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Neal, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 26, 1998.