5 Cal.Rptr.3d 195 (2003)
112 Cal.App.4th 546
The PEOPLE, Plaintiff and Respondent,
v.
Mildred MURPHY, Defendant and Appellant.
No. D040040.
Court of Appeal, Fourth District, Division One.
October 6, 2003.
As Modified October 22, 2003.
Review Granted January 22, 2004.
*199 Laurel Nelson Smith, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Quisteen S. Shum and Heather F. Wells, Deputy Attorneys General, for Plaintiff and Respondent.
AARON, J.

I.

INTRODUCTION
Defendant Mildred Murphy appeals the denial of her motion to suppress evidence (Pen.Code,[1] § 1538.5, subd. (m)) after having pled guilty to possession of methamphetamine for sale (Health & Saf.Code, § 11378). Murphy contends that the police, in conducting a probation search of her house, failed to follow knock-notice requirements embodied in California law and, in so doing, violated the Fourth Amendment to the United States Constitution. We conclude that the search violated California knock-notice requirements and the Fourth Amendment, and that the evidence must be suppressed.

II.

FACTUAL AND PROCEDURAL BACKGROUND[2]
At approximately 12:45 p.m. on November 7, 2001, following a citizen's complaint, Detective Alberto Santana of the San Diego County Sheriffs Department Street Narcotics Team (team) observed a woman leave Murphy's residence, get into a car and drive away. Santana suspected a drug transaction had taken place. He followed the car and stopped it. The woman admitted she had obtained methamphetamine from Murphy. Santana decided to conduct a probation search of Murphy's residence.[3] While Detective John Marlow was conducting surveillance of the residence, Santana developed an operational plan for the search. Santana was familiar with the layout of the house because he had had previous contact with Murphy. Because Santana had observed people coming out of Murphy's converted bedroom in the garage, he decided that the search team should enter through the garage.
During the surveillance, Marlow observed Murphy greet a Hispanic male in front of her house. Murphy and the man walked around the side of the house and reappeared a few minutes later. It appeared to Marlow that Murphy and the man were exchanging something. Shortly thereafter, Santana and several other members of the team arrived at Murphy's residence. The team members were all wearing plain clothes, but also had on black bulletproof vests with the word "Sheriffs" on them, and hats marked with the words "Sheriffs Narcotics." Marlow also observed a second, "totally separate person" near the garage of Murphy's residence. After Santana and the other members of the search team arrived, Marlow motioned to his partners on the team to alert them to this person's presence.
*200 Santana and the other officers approached the person, who was later identified as Michael Thomaselli. At the time the officers approached him, Thomaselli was located around the corner of the garage. Santana noticed that Thomaselli's hand was clenched. Santana pointed a gun at Thomaselli and "[i]n a loud voice ... [a]lmost yelling," said to him, "Sheriffs Department. Probation search. Get on the ground." The other members of the team were yelling, "Sheriffs Department," and they all had their guns drawn. It was later determined that Thomaselli was repairing a fence for Murphy and that he was holding some screws in his hand. At no time did any of the officers observe any interaction between Murphy and Thomaselli.
As the officers confronted Thomaselli, Santana heard a dog barking loudly from inside Murphy's house. Approximately five to seven seconds later, Santana entered the residence, without knocking. Santana said he did not knock because he feared that "anyone in the residence or in the bedroom would have heard us" yelling at Thomaselli. Santana testified that "seeing the sliding glass window was opened and a dog was barking, we continued in." Santana believed the team was in a "compromise" situation and explained that they entered the house without knocking because they feared persons in the residence might arm themselves, destroy evidence, or flee. Santana testified that he and "about four or five members of his team" entered the house as soon as "everybody was in line ready to go." All of the officers entered the house with their guns drawn.
Upon searching the residence, the law enforcement officers found Murphy at the opposite end of the house from where they had entered, in a bedroom with her bedridden ex-husband. Murphy was read her Miranda[4] rights and waived them. Murphy admitted having sold methamphetamine and showed the officers the location of a scale and six baggies that contained methamphetamine. The officers also found several "pay and owe" sheets in Murphy's house.
Thomaselli testified that when he encountered the officers, they ordered him to the ground, at gunpoint. After he was on the ground, the officers asked him whether Murphy was inside the house, and he told them she was. Thomaselli did not see them enter the house.
Murphy testified on her own behalf. She was in a back bedroom with the door shut, caring for her invalid ex-husband when the officers entered her residence. She heard someone calling her name and was disturbed because she did not know who it was. Prior to hearing her name called, she did not believe she had heard anyone say anything about police or probation. After she heard her name called, Murphy opened the bedroom door and found one of the officers standing in the doorway, pointing a gun at her face. He told Murphy to put up her hands.
On November 9, 2001, Murphy was charged with possession of methamphetamine for sale (Health & Saf.Code, § 11378). Murphy pled not guilty. She filed a motion to suppress evidence, pursuant to section 1538.5, in which she claimed that in conducting the search, the officers had violated California knock-notice requirements and the Fourth Amendment. The People filed an opposition. The preliminary examination hearing served also as an evidentiary hearing for the motion to suppress and the probation revocation.
With regard to the motion to suppress, the court found there were no exigent circumstances that would excuse the officers' duty to comply with knock-notice requirements. The court found that at the time they entered Murphy's residence, the officers had no reason to believe drugs *201 were being flushed or otherwise destroyed, or that anyone in the house was arming himself or herself. In addition, they had no reason to believe Murphy was likely to be armed, and they could see she was not attempting to flee.
However, the court determined that the officers' shouting at Thomaselli constituted sufficient notice to the occupants of Murphy's residence of the impending search to satisfy knock-notice requirements. The court observed that the officers' entry occurred "at least five to seven seconds [after they shouted at Thomaselli], I think it was probably longer, certainly from Mr. Thomaselli's testimony." The court opined that this was "plenty of time once that notification is made for someone to come to the door and find out what the heck is going on." The court denied the motion to suppress on the ground that the officers had substantially complied with knock-notice requirements. The court also found the evidence was sufficient to hold the defendant to answer to the methamphetamine charge and revoked her probation.
Murphy filed a motion to set aside the information, pursuant to section 995, on the ground that the law enforcement officers had violated knock-notice requirements. The People filed an opposition. The trial court denied the motion. Murphy then pled guilty to the charge of possession of methamphetamine for sale. The trial court placed Murphy on probation for a period of three years on the condition that she serve 210 days in custody, and fined her $550. The court later determined that Murphy was eligible for electronic surveillance and revised the 210 days' commitment order accordingly. Murphy filed a timely appeal.

III.

DISCUSSION
"In reviewing a ruling on a motion to suppress evidence, we defer to the trial court's findings of fact, whether express or implied, if those findings are supported by substantial evidence. We independently determine the relevant legal principles and apply those principles in evaluating the reasonableness of the search based on the facts as found by the trial court." (People v. Mays (1998) 67 Cal.App.4th 969, 972, 79 Cal.Rptr.2d 519.)

A. The Evidence Was Obtained in Violation of Knock-Notice Requirements

1. Knock-Notice Requirements Apply to Probation Searches
Section 1531 provides that, in executing a search warrant, "[t]he officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance." (§ 1531.) "The term `knock-notice' refers to the requirement of section 1531 ... that a law enforcement officer, before entering a house to execute a search warrant, give notice of his or her authority and purpose and be refused admittance either actually or constructively." (People v. Mays, supra, 67 Cal.App.4th at p. 973, 79 Cal. Rptr.2d 519, fn. omitted.)
"In California, a person may validly consent in advance to warrantless searches and seizures in exchange for the opportunity to avoid serving a state prison term. [Citations.]" (People v. Robles (2000) 23 Cal.4th 789, 795, 97 Cal.Rptr.2d 914, 3 P.3d 311.) In People v. Constancio (1974) 42 Cal.App.3d 533, 116 Cal.Rptr. 910, the court held that "probation searches are subject to implied conditions of reasonableness compelled by the provisions of the Fourth Amendment" and, specifically, that section 1531 provides the test *202 by which that reasonableness is measured. (People v. Constancio, supra, at p. 542,116 Cal.Rptr. 910.) It is now well established that "the knock-notice provisions of sections 844[[5]) and 1531 apply to searches conducted pursuant to a probation condition." (People v. Lilienthal (1978) 22 Cal.3d 891, 900, 150 Cal.Rptr. 910, 587 P.2d 706; see, e.g., People v. Mays, supra, 67 Cal.App.4th at p. 973, fn. 4, 79 Cal. Rptr.2d 519 ["courts have consistently held that initial entries into a home by law enforcement officers to conduct a probation ... search ... must comply with the knock-notice requirements of section 1531"].)

2. There Were No Exigent Circumstances Sufficient To Excuse Compliance with Knock-Notice Requirements
In Richards v. Wisconsin (1997) 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (Richards ), the United States Supreme Court provided the standard for determining whether the failure of law enforcement officers to comply with knock-notice requirements renders a search unreasonable under the Fourth Amendment. The court held, "In order to justify a `no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." (Richards, supra, at p. 394, 117 S.Ct. 1416, italics added.) In so holding, the court expressly rejected the contention that "exigent circumstances justifying a no-knock entry are always present in felony drug cases." (Id. at p. 390, 117 S.Ct. 1416.) The court further held that, "in each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." (Id. at p. 394, 117 S.Ct. 1416, italics added.)[6]
Applying this standard, the court in Richards found that such circumstances existed in that case. (Richards, supra, 520 U.S. at pp. 395-396, 117 S.Ct. 1416.) The police had obtained a search warrant to search Richards' motel room for drugs and related paraphernalia. (Id. at p. 388, 117 S.Ct. 1416.) When the officers initially knocked on the door of the motel room, Richards cracked it open and saw a uniformed officer standing behind an officer dressed as a maintenance man. Richards then slammed the door. The court noted that the trial court had concluded "the *203 officers could gather from Richards' strange behavior when they first sought entry that he knew they were police officers and that he might try to destroy evidence or to escape." (Id. at p. 389, 117 S.Ct. 1416.) The Richards court agreed with the trial court that, based on these circumstances, the officers' decision to enter without first announcing their presence and authority was justified. (Id. at p. 396, 117 S.Ct. 1416.)
In the present case, at the preliminary examination hearing Santana testified he did not knock before entering Murphy's residence because he believed the encounter with Thomaselli outside Murphy's house had "compromise[d]" the operation, and that "persons in the residence could possibly arm themselves, could possibly destroy evidence or possibly run." However, on cross-examination, Santana could point to no facts to substantiate his fears, and the People presented no other evidence that would support such concerns. Instead, the People relied on these same generalized fears in arguing that the circumstances warranted dispensing with knock-notice requirements.
The trial court determined there were no facts known to the law enforcement officers that would support a belief that knocking would have posed a danger to them, that evidence would be destroyed, or that Murphy would attempt to flee. Accordingly, the court determined no exigent circumstances existed at the time the officers entered Murphy's residence that would excuse their failure to comply with the knock-notice requirement.
On appeal, in arguing that there were exigent circumstances justifying the officers' actions, the People raise the following points: (1) the officers knew Murphy had just been a party to a drug transaction at the residence; (2) the officers' shouting at Thomaselli outside Murphy's house, and the barking dog, served to notify any occupants of the presence of the officers; (3) the officers announced their presence and purpose after they entered the residence; and (4) the officers reasonably believed the occupants of the house had been notified of their presence.
None of these facts, either independently or in combination, constitute exigent circumstances justifying a no-knock entry under Richards. The fact that the law enforcement officers observed Murphy engage in a suspected drug transaction prior to their entering the house does not constitute an exigent circumstance (Richards, supra, 520 U.S. at p. 394, 117 S.Ct. 1416), and the last three points relate to whether the officers substantially complied with knock-notice requirements, not whether exigent circumstances existed. Moreover, unlike Richards, in which the United States Supreme Court concluded that the defendant's slamming a door in the face of police officers could give rise to a reasonable suspicion that drugs might be destroyed in the place to be searched, or that the defendant might try to escape (id. at pp. 395-396, 117 S.Ct. 1416), in this case, there were no specific and articulable facts from which the officers could reasonably infer that any occupant of the house would destroy evidence or attempt to flee.
California courts have also held that generalized fears, such as those present in this case, are insufficient to support a finding of exigent circumstances. (See, e.g., People v. Neer (1986) 177 Cal.App.3d 991, 995, 223 Cal.Rptr. 555 ["nothing [the police officer] knew permitted an objectively reasonable belief exigent circumstances existed.... A generalized belief based on the fact this was a narcotics investigation is insufficient"].) In People v. Gastelo (1967) 67 Cal.2d 586, 588, 63 Cal.Rptr. 10, 432 P.2d 706 (Gastelo), the California Supreme Court held that "[u]nder the Fourth *204 Amendment, a specific showing must always be made to justify any kind of police action tending to disturb the security of people in their homes." (Gastelo, supra, at p. 588, 63 Cal.Rptr. 10, 432 P.2d 706.) The Gastelo court further held that "an asserted general propensity of narcotics violators to destroy evidence when confronted by police officers" was insufficient to justify an "unannounced forcible entry." (Id. at p. 589, 63 Cal.Rptr. 10, 432 P.2d 706.)
The People rely on People v. Flores (1982) 128 Cal.App.3d 512, 180 Cal.Rptr. 368 (Flores) to support their argument that there were exigent circumstances in this case sufficient to excuse the officers' failure to comply with knock-notice requirements. In Flores, one defendant, Flores, engaged in a drug transaction near a house, while a second defendant, Dominguez, who had assisted in the transaction, went back into the house. (Id. at p. 518, 180 Cal.Rptr. 368.) After realizing police officers were present, Flores started to run back to the house, at which time the police yelled at him to stop, and placed him under arrest. (Ibid.) A police officer then went to the front door of the house, saw that the screen door was ajar and the front door open, and yelled, "Police officer with a search warrant. Demand an entry," before entering one or two seconds later. (Id. at pp. 518-519, 180 Cal.Rptr. 368.) In finding exigent circumstances sufficient to excuse compliance with knock-notice requirements, the Flores court relied on two factors, neither of which are sufficient under current law:
"[T]he specific facts known to [the police officer] included the immediately preceding large heroin sale actively engaged in by Dominguez whom he knew was inside the same house where heroin sales of increasing amounts were completed in four of the past six days and, as the trial court emphasized, the yelling at Flores just outside the open front door which he reasonably could consider as having warned those inside of the officers' presence and purpose." (Id. at p. 521, 180 Cal.Rptr. 368.)
First, with regard to the existence of drug sales, the California Supreme Court's decision in Gastelo, which was not cited by the Court in Flores, and the United States Supreme Court's subsequent decision in Richards, make it clear that the officers' knowledge of drug activity at the place to be searched is an insufficient basis upon which to justify a no-knock entry. Second, to the extent Flores can be read to suggest that if the occupants of a place to be searched have been notified of the presence of the police, this constitutes an exigent circumstance, we disagree. "[W]arn[ing] those inside of the officers' presence and purpose" is one of the purposes of knock-notice requirements, not an exigent circumstance excusing compliance. (Flores, supra, 128 Cal.App.3d at p. 521,180 Cal.Rptr. 368.)
Richards lists three circumstances that may justify a no-knock entry: a reasonable suspicion of dangerousness, futility, or the possibility that the effective investigation of the crime might be inhibited by, for example, allowing the destruction of evidence. (Richards, supra, 520 U.S. at p. 394, 117 S.Ct. 1416.) An officer's belief that he may have "compromise[d]" the search operation by possibly giving the occupants five seconds notice before entering is not a basis for a no-knock entry under Richards. Accordingly, we conclude that the trial court correctly determined that the police in this case did not have "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for *205 example, allowing the destruction of evidence." (Ibid.)

3. The Law Enforcement Officers Did Not Substantially Comply with Knock-Notice Requirements
The People contend that even if there were not exigent circumstances excusing compliance with knock-notice requirements, the officers in this case "substantially complied" with section 1531.
Section 1531 "requires that two conditions be satisfied before forcible entry is permitted: (1) the officer must announce his authority and purpose, and (2) he must be refused entry. The refusal of entry may be implied, as where an occupant fails within a reasonable time to respond to a police demand that he open the door." (People v. Gonzalez (1989) 211 Cal.App.3d 1043, 1047, 259 Cal.Rptr. 846.)
The purposes of section 1531 are: "`(1) the protection of the privacy of the individual in his home [citations]; (2) the protection of innocent persons who may also be present on the premises where an arrest is made [citation]; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice [citations]; and (4) the protection of police who might be injured by a startled and fearful householder.'" (People v. Peterson (1973) 9 Cal.3d 717, 723, 108 Cal.Rptr. 835, 511 P.2d 1187, quoting Duke v. Superior Court (1969) 1 Cal.3d 314, 321, 82 Cal.Rptr. 348, 461 P.2d 628.) While "[t]he protection of the privacy of the individual in his home ... is not impinged upon by a probation search at the probationer's place of residence since the probationer has waived his claim to privacy therein ... the remaining policies and purposes underlying the statutory knock-notice provisions must be satisfied" in the context of a probation search. (People v. Constancio, supra, 42 Cal. App.3d at pp. 543-544, 116 Cal.Rptr. 910.)
The California Supreme Court has held that "[s]ubstantial compliance [with knock-notice requirements] ... can occur only when ... there has been some attempt to comply." (People v. Hall (1971) 3 Cal.3d 992, 998, fn. 3, 92 Cal.Rptr. 304, 479 P.2d 664.) Substantial compliance in this context means "actual compliance in respect to the substance essential to every reasonable objective of the statute, as distinguished from `mere technical imperfections of form.'" (People v. Jacobs (1987) 43 Cal.3d 472, 483, 233 Cal.Rptr. 323, 729 P.2d 757, quoting Camp v. Board of Supervisors (1981) 123 Cal.App.3d 334, 348, 176 Cal.Rptr. 620, first italics in original, second italics added.)
In this case, there was no attempt on the part of the law enforcement officers to comply with knock-notice requirements, the elements of the requirements were not satisfied, and the purposes of the requirements were not met. Thus, it is clear there was not substantial compliance with knock-notice requirements.

a. There Was No Attempt To Comply with Knock-Notice Requirements
One purpose of the knock-notice requirement is to alert persons inside the place to be searched of the presence of the police and their intent. After giving such notice, the police are required to wait for a reasonable time to give the occupants a chance to respond to the request for admittance. (See, e.g., People v. Uhler (1989) 208 Cal.App.3d 766, 769, 256 Cal. Rptr. 336.) Here, it is undisputed that the officers did not knock before entering Murphy's residence. The trial court found that the officers' shouting at Thomaselli outside the residence served to notify the occupants of the presence of the officers *206 and their intent to conduct a search of the residence. Even if this is true, there is no evidence that the officers intended to provide such notice. Further, there is nothing to indicate that the officers believed they had been refused admission before they entered Murphy's residence. Rather, as Santana testified, the officers in this case intentionally entered without knocking and without being refused admittance because they believed there was a possibility the people in the house had inadvertently been given notice of the officers' presence, and that this excused the officers from complying with knock-notice requirements.[7] Thus, the officers did not "attempt to comply" with knock-notice requirements. (People v. Hall, supra, 3 Cal.3d at p. 998, fn. 3, 92 Cal.Rptr. 304, 479 P.2d 664.)

b. There Was Neither Actual Nor Implied Refusal of Admittance
After announcing their presence, the police must either be refused admittance or wait a sufficient time to conclude that they have been impliedly refused admittance before they may enter. (See People v. Uhler, supra, 208 Cal.App.3d at p. 769, 256 Cal.Rptr. 336 [reviewing cases discussing failure to wait sufficient time after announcement].) In this case there was neither an actual nor an implied refusal. The officers admit they never knocked on Murphy's door nor requested admittance, and it is undisputed that there was no actual refusal of admittance. With regard to implied refusal, the People do not attempt to argue that the officers waited a sufficient time to allow the occupants of the residence to refuse admittance, and the record establishes that they did not wait for a refusal of admittance before entering.
In People v. Neer, supra, 177 Cal.App.3d at pages 994 through 995, 223 Cal.Rptr. 555, the court considered a knock-notice case with facts similar to those in this case. In Neer, a detective and three other officers arrived at the residence in question to serve a search warrant. The officers detained Neer, who was working in the front yard. At the time, the officers were unaware of his identity. One of the officers shouted, "We're the police department, don't move ... we have a search warrant." The detective went to the closed screen door, where he could see a woman with a child sitting on a couch and a man standing in the kitchen area. The detective identified himself as a police officer and said that he had a search warrant. He then "opened the door immediately" and entered. The detective testified that he entered "because [he] believed the occupants had heard both announcements and feared they would flee, destroy contraband or arm themselves." (Ibid.)
The court noted that the record contained no evidence as to how much time had elapsed between the initial encounter with Neer and the entry into the house, and observed that delays after the police announce their presence of "six seconds (People v. Abdon (1972) 30 Cal.App.3d 972, 106 Cal.Rptr. 879); fifteen seconds (Greven v. Superior Court [1969] 71 Cal.2d 287, 78 Cal.Rptr. 504, 455 P.2d 432); thirty seconds (Duke v. Superior Court, supra, 1 Cal.3d 314, 82 Cal.Rptr. 348, 461 P.2d 628); and forty-five seconds (People v. Norton (1970) 5 Cal.App.3d 955, 86 Cal.Rptr. 40) ha[d] been held to be inadequate under the circumstances of those cases." (People v. Neer, supra, 177 Cal.App.3d at p. 996, 223 Cal.Rptr. 555, italics added). Ultimately, the court held that the "[police officer] could not have reasonably believed there had been an implied refusal" and that the trial court had thus erred in concluding *207 there had been substantial compliance with the knock-notice requirements. (Ibid.)
Neer is consistent with numerous other cases in which courts have held that even where police knock and wait a short period of time before entering, a finding of implied refusal is not warranted. (See, e.g., People v. Gonzalez, supra, 211 Cal.App.3d at pp. 1047,1051, 259 Cal.Rptr. 846 [rejecting argument that "inaction of an occupant for five seconds reasonably can be construed as a refusal of entry," where police knocked on door, occupant came to the door, asked "who is it?", and the police forcibly opened door]; Jeter v. Superior Court (1983) 138 Cal.App.3d 934, 936, 188 Cal.Rptr. 351 [concluding no implied refusal could be found where officer knocked on front door and yelled, "Police officers, we have a search warrant," waited a "few seconds," knocked and yelled again, and then, after waiting "five or ten seconds," opened the door].)[8]
In this case, the law enforcement officers knew Murphy was home and were familiar with the layout of her house. Santana testified that after the officers entered the house, they found Murphy in a bedroom farthest from their point of entry. Between the door the officers entered and the bedroom in which Murphy was found, there is a garage, a dining room, a living room and a hallway. The officers entered the house five to seven seconds after they first shouted at Thomaselli.[9]
The People argue that "to the extent the detectives failed to wait a sufficient amount of time for refusal before entry," that failure was "a minor technicality [that] did not cancel their substantial compliance ...." To the contrary, the failure to wait a sufficient amount of time for refusal is not a "minor technicality." As discussed above, such failures have routinely served as the basis for courts finding that police officers failed to comply with knock-notice requirements. (See, e.g., People v. Uhler, supra, 208 Cal.App.3d at p. 769, 256 Cal. Rptr. 336 [reviewing case law and noting, "Absent exigent circumstances, the Fourth Amendment and article I, section 13 of the California Constitution are generally violated when officers force entry without allowing the occupants the opportunity to admit them"].)[10]

*208 c. The Policy Served by Knock-Notice Requirements Was Not Met

In determining whether the police have substantially complied with knock-notice requirements, the California Supreme Court has instructed courts to consider whether the policy of "preventing violent confrontations between startled householders and the police" was served by the manner of entry. (People v. Jacobs, supra, 43 Cal.3d at p. 483, 233 Cal. Rptr. 323, 729 P.2d 757.)
In Jacobs, the California Supreme Court held that there was no substantial compliance with knock-notice requirements despite the fact that the officers in that case knocked on the door and entered the residence only after an 11-year-old child had opened the door. (People v. Jacobs, supra, 43 Cal.3d at p. 476, 233 Cal.Rptr. 323, 729 P.2d 757.) After first holding that it was unreasonable for the officers to conclude that the child had either actual or apparent authority to consent to the officers' entry into the house (id. at p. 482, 233 Cal.Rptr. 323, 729 P.2d 757), the Court held that the policy of preventing potentially violent confrontations embodied in the knock-notice requirement was not met because of "the likelihood that an adult occupant [would] be startled by the apparently unauthorized intrusion and react violently out of concern for the safety of the child." (Id. at p. 483, 233 Cal.Rptr. 323, 729 P.2d 757.)
The People rely on two cases to support their argument that the officers in this case substantially complied with knock-notice requirements. However, the facts in those cases are clearly distinguishable from the facts here. In People v. Uhler, supra, 208 Cal.App.3d 766, 256 Cal. Rptr. 336, the police officer saw the occupants of the place to be searched through a screen door, believed he had made eye contact with two of them, showed them his badge, and demanded entry. (Id. at p. 768, 256 Cal.Rptr. 336.) In People v. Patterson (1979) 94 Cal.App.3d 456, 156 Cal. Rptr. 518, the police knocked on the door, spoke with a child occupant, and entered while an adult occupant simultaneously called out, "Come in." (Id. at pp. 459, 461, 156 Cal.Rptr. 518.) Here, in contrast, the officers did not knock or request admittance, the door was not opened by an occupant, and the officers had no contact of any kind with anyone in the residence prior to their entry. Rather, four or five law enforcement officers suddenly invaded the home with their guns drawn.
Neither the elements nor the purposes of the knock-notice requirements were met by the manner of the police officers' entry into Murphy's residence. Courts in cases with analogous circumstances have not found substantial compliance on the part of police. We conclude that the law enforcement officers in this case did not substantially comply with knock-notice requirements.

B. The, Officers' Failure To Comply with Knock-Notice Requirements Renders the Search Unconstitutional Under the Fourth Amendment; All Evidence Seized Must Be Suppressed
"In Wilson v. Arkansas, [supra,] 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976[ ], [the United States Supreme Court] held that the Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must *209 knock on the door and announce their identity and purpose before attempting forcible entry." (Richards, supra, 520 U.S. at p. 387, 117 S.Ct. 1416.) Following Wilson, the Supreme Court in Richards held, "[i]n order to justify a `no-knock' entry," police are required to have a "reasonable suspicion" of certain specified exigent circumstances. (Richards, supra, 520 U.S. at pp. 394-395, 117 S.Ct. 1416.) Similarly, both the California Supreme Court and the California Court of Appeal have concluded that "an entry effected in violation of the provisions of ... section 1531 renders any subsequent search and seizure `unreasonable' within the meaning of the Fourth Amendment." (Duke v. Superior Court, supra, 1 Cal.3d at p. 325, 82 Cal. Rptr. 348, 461 P.2d 628; see also e.g., People v. Jacobs, supra, 43 Cal.3d at p. 484, 233 Cal.Rptr. 323, 729 P.2d 757, Jeter v. Superior Court, supra, 138 Cal.App.3d at p. 938, 188 Cal.Rptr. 351; People v. Neer, supra, 177 Cal.App.3d at p. 997, 223 Cal.Rptr. 555 [all applying Duke's holding that failure to comply with knock-notice requirements constitutes a violation under the Fourth Amendment].)
In this case, there was neither actual nor substantial compliance with knock-notice requirements, and there were no exigent circumstances excusing compliance. For these reasons, we conclude that the search was unreasonable under the Fourth Amendment.

1. Evidence Obtained as a Result of the Failure To Comply with Knock-Notice Requirements Must Be Suppressed
"An unexcused failure to fulfill the knock and notice requirements delineated by section 844 nullifies the subsequent search and requires exclusion of the evidence obtained. (Mapp v. Ohio (1961) 367 U.S. 643, 655, 660, 81 S.Ct. 1684, 6 L.Ed.2d 1081; [citations].)" (Duke v. Superior Court, supra, 1 Cal.3d at p. 325, 82 Cal.Rptr. 348, 461 P.2d 628.) Suppression is also required for violation of the knock-notice requirements contained in section 1531. (Gastelo, supra, 67 Cal.2d at p. 589, 63 Cal.Rptr. 10, 432 P.2d 706.)
After a scholarly and lengthy analysis, the court in Neer concluded that notwithstanding "the enactment of California Constitution article I, section 28, subdivision (d) by Proposition 8 in June 1982,[11] a section 1531 violation still calls for the exclusion of the evidence obtained." (People v. Neer, supra, 111 Cal.App.3d at p. 997, 223 Cal.Rptr. 555.) The year after Neer was decided, the California Supreme Court held in a post-Proposition 8 case that "[n]oncompliance with [Penal Code] section 844 renders any search and seizure following the entry unreasonable within the meaning of the Fourth Amendment (Duke v. Superior Court, supra, 1 Cal.3d at p. 325, 82 Cal.Rptr. 348, 461 P.2d 628)," and that the evidence obtained in violation of knock-notice requirements should be suppressed. (People v. Jacobs, supra, 43 Cal.3d at p. 484, 233 Cal.Rptr. 323, 729 P.2d 757, fn. omitted.) Thus, Proposition 8 did not undermine the California Supreme Court's repeated holdings to the effect that federal law requires that evidence obtained as a result of a failure to comply with knock-notice requirements violates the Fourth Amendment and must be suppressed. (See, e.g., People v. Tacy (1987) 195 Cal.App.3d 1402, 1413-1414, 241 Cal. *210 Rptr. 400 ["concluding] that Duke v. Superior Court, supra, 1 Cal.3d 314, 325, 82 Cal.Rptr. 348, 461 P.2d 628, retains its vitality despite the advent of Proposition 8"].)

2. The Evidence Is Not Admissible Under the Inevitable Discovery Exception to the Exclusionary Rule
The People argue that even if the search in this case was unlawful, the evidence seized from Murphy's residence should not be suppressed, pursuant to the inevitable discovery exception to the exclusionary rule.
"Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. As the United States Supreme Court has explained, the doctrine `is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.'" (People v. Robles, supra, 23 Cal.4th at p. 800, 97 Cal.Rptr.2d 914, 3 P.3d 311, quoting Murray v. United States (1988) 487 U.S. 533, 539, 108 S.Ct. 2529, 101 L.Ed.2d 472.)
It is the prosecution's burden to "establish by a preponderance of the evidence that the information would have been discovered by lawful means," in order for the doctrine to apply. (Nix v. Williams (1984) 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (Nix).) In this case, the People did not raise the inevitable discovery argument below. Notwithstanding this omission, "the inevitable discovery doctrine ... may be applied on appeal if the factual basis for the theory is fully set forth in the record." (People v. Robles, supra, 23 Cal.4th at p. 801, fn. 7, 97 Cal. Rptr.2d 914, 3 P.3d 311.)
The People argue that even if the law enforcement officers in this case failed to comply with knock-notice requirements, the evidence seized would inevitably have been discovered, based on Murphy's Fourth Amendment waiver. They maintain that "its discovery was the product of a valid Fourth Amendment waiver, not the detectives' mode of entry." The essence of the People's argument is that a per se inevitable discovery exception applies to any probationary search in which a knock-notice violation occurs. This contention involves a pure question of law, and Murphy does not maintain that the People have waived the issue by failing to raise it below. We exercise our discretion to consider the issue. (See, e.g., People v. Blanco (1992) 10 Cal.App.4th 1167, 1172, 13 Cal. Rptr.2d 176; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 398 ["The rule that the appellate court will not consider points not raised below ... does not apply to ... [a] [q]uestion of [l]aw."].)
In support of the argument that the inevitable discovery doctrine applies in this case, the People rely principally on Nix, supra, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377. In Mac, the police violated the defendant's Sixth Amendment right to counsel by improperly interrogating him outside the presence of his attorney. During the unlawful interrogation, the police learned from Williams the location of the body of a young girl he had murdered. (Nix, supra, 467 U.S. at pp. 435-437, 104 S.Ct. 2501.) Williams's first conviction was reversed due to the Sixth Amendment violation. In the retrial, the prosecution neither used the defendant's statements nor offered evidence that he had directed police to the body. (Nix, supra, p. 437, 104 S.Ct. 2501.) Instead, the prosecution presented detailed testimony regarding an *211 independent search for the girl that had taken place, the team's search methods, and the likelihood that the search team would inevitably have found the body even without the defendant's statements. (Id. at pp. 448-449,104 S.Ct. 2501.)
After reviewing the evidence of the independent search, the United States Supreme Court concluded, "[I]t is clear that the search parties were approaching the actual location of the body, and we are satisfied ... that the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found." (Nix, supra, 467 U.S. at pp. 449-450, 104 S.Ct. 2501.) Under such circumstances, the Nix court held that the "evidence was admissible under the inevitable discovery exception to the exclusionary rule." (Id. at p. 450, fn. 7, 104 S.Ct. 2501.)
A majority of courts that have considered whether the inevitable discovery doctrine announced in Nix should apply in the context of a knock-notice violation have rejected its application. (See, e.g., State v. Lee (2003) 374 Md. 275, 821 A.2d 922, 937 (collecting cases); Kellom v. State (Fla. App.2003) 849 So.2d 391, 396 (collecting cases); see also United States v. Dice (6th Cir.2000) 200 F.3d 978, 984-985; United States v. Holmes (D.Me.2002) 183 F.Supp.2d 108, 111.)[12] In reaching the conclusion that the exception does not apply in cases of knock-notice violations, courts have relied on the fact that Nix requires the prosecution to show that the evidence "would inevitably have been discovered without reference to the police error or misconduct" (Nix, supra, 467 U.S. at p. 448, 104 S.Ct. 2501), and that such a showing cannot usually be made in the context of a knock-notice violation. (See, e.g., United States v. Dice, supra, 200 F.3d at p. 986 [concluding inevitable discovery doctrine did not apply to knock-notice violation because government did not show "`that the evidence inevitably would have been obtained from lawful sources in the absence of the illegal discovery'"], quoting United States v. Leake (6th Cir.1996) 95 F.3d 409, 412; United States v. Gonzalez (D.Mass.2001) 164 F.Supp.2d 119, 123, fn. 2 [rejecting inevitable discovery exception application to knock-notice violation because "there was only one search, and no other independent means of discovery appeared on the horizon"].)
In discussing whether the inevitable discovery doctrine should generally apply to knock-notice violations, many courts have also noted that Nix was premised upon the rationale that the application of the exception "must not significantly weaken Fourth Amendment protections." (United States v. Gonzalez, supra, 164 F.Supp.2d at p. 123, fn. 2.) These courts have reasoned that Nix should not apply in the knocknotice context, since "application of the inevitable discovery doctrine ... would read the knock and announce requirement of the Fourth Amendment out of the Constitution...."[13] *212 (State v. Lee, supra, 821 A.2d at p. 946.) The court in United States v. Shugart explained:
"If the [inevitable discovery] exception were to apply [to knock notice violations], officers could obviate their obligation to provide notice of their authority and purpose prior to entering a person's household whenever they had a valid warrant authorizing the search of the home. In those situations, officers would know their misconduct would have no unfavorable consequences, and simply stated, the exception would swallow the rule." (United States v. Shugart (E.D.Tex.1995) 889 F.Supp. 963, 977, aff'd. (5th Cir.1997) 117 F.3d 838.)
This observation applies with equal force to probation searches where there is a Fourth Amendment waiver.
In Nix, there was ah actual, independent search taking place contemporaneously with the illegal interrogation of Williams, and the Court concluded that the search team would inevitably have found the girl's body even without the illegally obtained statements. Here, in contrast, there is no evidence that a lawful search of Murphy's home would even have actually taken place. In the absence of such evidence, the inevitable discovery exception to the exclusionary rule cannot apply.
We acknowledge that some courts have applied the inevitable discovery doctrine to knock-notice violations. (See, e.g., United States v. Langford (7th Cir.2002) 314 F.3d 892; People v. Stevens (1999) 460 Mich. 626, 597 N.W.2d 53; see also People v. Hoag (2000) 83 Cal.App.4th 1198,1212,100 Cal.Rptr.2d 556 [Morrison, J. concurring].) These courts have reasoned that: (1) tort remedies are available to deter searches conducted in violation of knock-notice requirements; (2) the inevitable discovery doctrine should apply where the prosecution is put neither in a better nor worse position by the illegal search; and (3) the evidence would inevitably have been discovered because the police had the right to conduct the search.
We find these reasons unpersuasive. First, tort remedies are available to deter any kind of unlawful search; the existence of the exclusionary rule presupposes that civil remedies alone are inadequate to deter unlawful conduct by the police. Second, applying the inevitable discovery doctrine in this context would put the prosecution in a better position by allowing it to benefit from the fruits of an unreasonable search where there is no evidence that the evidence would otherwise have been discovered in a lawful manner. Finally, the fact that law enforcement officers had the right to conduct a search lawfully cannot justify application of the inevitable discovery doctrine.
In the context of a knock-notice violation where there is no evidence that a subsequent search would have been conducted, to apply the inevitable discovery doctrine one would have to find that a hypothetical search would have been undertaken, and that it would have been executed in a lawful manner.[14] We are unwilling to assume *213 that the officers in this case would have conducted the search of Murphy's residence lawfully, if they had not in fact conducted it unlawfully. (See United States v. Dice, supra, 200 F.3d at pp. 986-987; United States v. Espinoza (7th Cir. 2001) 256 F.3d 718, 731 (Wood, J. dissenting) [inevitable discovery doctrine should not apply where "officers ... spell out after the fact a hypothetical scenario by which they could have properly obtained the evidence"].) To apply the inevitable discovery exception in this manner would effectively eliminate knock-notice requirements from the Fourth Amendment. We decline to do so.

IV.
CONCLUSION
The evidence was obtained in violation of California's knock-notice requirements and the Fourth Amendment to the United States Constitution and must be suppressed.

V.

DISPOSITION
The judgment is reversed.
I CONCUR: O'ROURKE, J.
BENKE, Acting P.J.
I respectfully dissent. Under the reasonable suspicion standard we are required to apply, exigent circumstances existed in this case justifying an entry without knocking and giving notice. I also conclude that, under the circumstances, the officers substantially complied with the announcement rule. Finally, while these conclusions make it unnecessary to do so, I address inevitable discovery since I believe the doctrine precludes suppression of the evidence seized.

A. Exigent Circumstances

My colleagues, like the trial court, conclude exigency requires that before an unannounced entry, law enforcement officers must possess particular facts on which they can conclude the occupants inside the residence harbor a present intention or are preparing to dispose of evidence, flee or engage in activity dangerous to the officers. There is support for this view of exigency. (People v. De Santiago (1969) 71 Cal.2d 18, 29, 76 Cal.Rptr. 809, 453 P.2d 353; see also People v. Dumas (1973) 9 Cal.3d 871, 878, 109 Cal.Rptr. 304, 512 P.2d 1208.) I believe, however, that in the context of drug enforcement cases this restrictive standard has been broadened and proof of exigency lowered by the reasonable suspicion standard of Richards v. Wisconsin (1997) 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615.) California Constitution article I, section 28, subdivision (d) (Prop.8) requires we use Richards's standard. That standard allows for emergencies where the officers may not have facts from which they can conclude the occupant of a residence is then destroying evidence, preparing to flee or posing a danger but nonetheless requires immediate entry. Our decision in People v. Flores (1982) 128 Cal.App.3d 512, 180 Cal.Rptr. 368, and this case present such circumstances. While the majority expressly disapproves Flores, I view that case, in light of Richards, as now having a clearly articulated constitutional basis for its holding. I believe the importance of this basis cannot be understated. Without it, law enforcement officers *214 in the midst of chaotic and dangerous situations such as were occurring in Flores, and indeed were occurring here, must stand by a door, knock and wait an undefined period of time for the drug dealer or dealers inside to respond. This is the requirement and result of my colleagues' holding. With all due respect, in light of Richards I am not prepared to so hold.

1. The reasonable suspicion standard of Richards is broader than the restrictive test relied upon by the majority.
The Richards opinion was the result of repeated attempts by the government to obtain judicial approval of a blanket no-knock exception in drug cases. In an earlier decision, Wilson v. Arkansas (1995) 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976, the Supreme Court held that while the method of an officer's entry into a dwelling is relevant to the reasonableness of a search or seizure, the Constitution does not mandate a rigid rule of announcement that ignores "countervailing law enforcement interests." (Id. at p. 934, 115 S.Ct. 1914.) The court left to the lower courts the task of determining what those relevant countervailing factors might be, but noted in remanding that factors such as a reasonable belief officer safety might be imperiled or that easily disposable narcotics might be destroyed could constitute such countervailing factors. (Id. at pp. 936-937,115 S.Ct. 1914.)
Two years later, in Richards, the court provided additional guidance on when in the course of drug investigations, countervailing law enforcement interests allow officers to enter dwellings without complying with announcement requirements.[1] The history of Richards is instructive.
In Richards the officers obtained a warrant allowing the search of a hotel room from which they believed drugs were being sold. In the early morning an officer dressed as a maintenance man approached the hotel room door followed by several plainclothes officers and at least one uniformed officer. After knocking, the officer at the door responded to a query from within by stating he was a maintenance man. The door with its security chain still in place was opened. Seeing the uniformed officer, defendant immediately closed the door. The officers waited two or three seconds, announced themselves as police officers, knocked down the door and entered. In the room the officers found drugs and arrested the defendant. (520 U.S. at pp. 388-389,117 S.Ct. 1416.)
The trial court refused to suppress the evidence seized, holding that based on the defendant's behavior the officers could reasonably conclude he was aware of their identity and if entry was not immediately made he might destroy evidence or escape. (Richards v. Wisconsin, supra, 520 U.S. at p. 389, 117 S.Ct. 1416.)
The Wisconsin Supreme Court took a more direct route to denying suppression. That court was disinterested in the particular facts of the unannounced entry. Instead, it noted that the officers had probable cause to believe drugs were being sold from the room. It concluded based on judicial opinions and other authoritative sources that all felony drug crimes involve a high risk of injury or death to the police as well as a high potential for the destruction *215 of evidence prior to entry. As a result of these concerns, the court concluded that in felony drug cases, exigent circumstances justifying entry without announcement always exist. The court stated the invasion of privacy occasioned by such entry was minimal since the officers had the right to enter without permission. It noted similar per se rules existed in other states. (Richards v. Wisconsin, supra, 520 U.S. at pp. 389-390,117 S.Ct. 1416.)
In a unanimous opinion authored by Justice Stevens, the United States Supreme Court rejected Wisconsin's per se unannounced entry rule for drug cases. However, while rejecting categorical rules based on the general risks inherent in drug investigations, the court set the following standard for unannounced entries in such cases: "In order to justify a `no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standardas opposed to a probable-cause requirementstrikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries." (Richards v. Wisconsin, supra, 520 U.S. at p. 394,117 S.Ct. 1416.)
The majority, adopting the reasoning of the trial court, concludes the reasonable suspicion standard requires law enforcement officers possess specific and articulable facts supporting a belief that knocking and giving notice would then pose a danger to them, would result in destruction of evidence or that the occupant would attempt to flee. Thus it chooses to define the reasonable suspicion standard in light of the restrictive test of pre-Richards California authority. With all due respect, I believe this is an incorrect analysis.
The court in Richards points out that the reasonable suspicion standard "is not high." (Richards v. Wisconsin, supra, 520 U.S. at p. 394, 117 S.Ct. 1416.) While Richards does not fully define the reasonable suspicion standard, other cases do. Thus, it has been noted that reasonable suspicion is established with less information, and less reliable information than is required to meet the test of probable cause, and can be established by considerably less than proof of wrongdoing by a preponderance of the evidence. (United States v. Sokolow (1989) 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1; Alabama v. White (1990) 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301; see also People v. Souza (1994) 9 Cal.4th 224, 230-231, 36 Cal.Rptr.2d 569, 885 P.2d 982.)
In United States v. Cortez (1981) 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621, the court further explains that "the essence of all that has been written" about the reasonable suspicion standard "is that the totality of circumstances the whole picturemust be taken into account.... [¶] ... [¶] The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductionsinferences and deductions that might well elude an untrained person.
"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the sameand so are law enforcement officers. Finally, the evidence thus collected must be seen and *216 weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."
Addressing the reasonable suspicion standard in the context of the protective sweep of a probationer's residence, the court in People v. Ledesma (2003) 106 Cal.App.4th 857, 863-864, 131 Cal.Rptr.2d 249, recently observed: "The high court has repeatedly held that in determining the existence of reasonable suspicion, courts must evaluate the `"totality of the circumstances'" on a case-by-case basis to see whether the officer has `"a particularized and objective basis"' for his or her suspicion. [Citation.] The court has emphasized the importance of allowing the officers on the scene `to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." [Citations.]' [Citation.] In addition, the court has been sharply critical of lower court decisions precluding police reliance on facts consistent with an innocent as well as a guilty explanation. [Citation.] The court has cautioned against restricting the range of facts considered in the calculus of reasonable suspicion. [Citations.] It has embraced the notion that `reasonable suspicion' is an abstract concept, not a `"finely-tuned standard[]"' [citations] and deliberately avoided encumbering its determination with a `"neat set of legal rules."' [Citations.] Finally, the court has warned lower courts to avoid the `unrealistic second-guessing' of police officers acting `in a swiftly developing situation.... [Citation.] A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished .... [Citation.] The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.' [Citation.]" (Ibid.)
Reliance on the judgment of officers in the field is particularly appropriate where they are operating on their "adversary's turf and where that turf is the site of ongoing narcotics activity which they may have reason to believe contains firearms, "one of the tools of the trade." (People v. Ledesma, supra, 106 Cal.App.4th at pp. 864-865,131 Cal.Rptr.2d 249.)
With all due respect, the majority opinion does not apply the reasonable suspicion standard. Indeed, it relegates an abbreviated definition of that important concept to a footnote and then ignores it. (p. 202.) It thereafter concludes the officers' observation of a "suspected" drug transaction "does not constitute an exigent circumstance." (p. 203.) It further concludes the shouting outside the house and the resulting notification to appellant of the officers' presence and purpose and the officers' reasonable belief the occupants knew they were present, "relate to whether the officers substantially complied with knocknotice requirements, not whether exigent circumstances existed." (p. 203.) Neither together nor separately do my colleagues consider these factors, or any other factors, relevant to an exigency analysis. (Ibid.)
By eliminating the surrounding circumstances from the exigency analysis, including the chaotic setting in which the six officers found themselves, my colleagues reject the very test Richards requires they employ, a test dependent upon all of the circumstances, including those they have eliminated.
Under the reasonable suspicion standard, the question before us is whether considering the experience of the officers, the nature of the crimes involved, the location of events and the circumstances rapidly *217 unfolding around them, these officers were justified in deducing their drug investigation was compromised and immediate entry was necessary, i.e., were the officers unreasonable in failing to act some other way. I conclude exigency existed.

2. The facts of this case support a finding of exigency.
This is not, as the majority suggests, a case involving "generalized fear" of drug sales, (p. 203.) Nor is it a case where there was merely "a suspected drug transaction." (p. 203.) At approximately 12:45 p.m. the narcotics team here, led by Santana, a very experienced narcotics detective, was called to the scene of appellant's house because a neighbor complained of ongoing suspicious activity at the residence. As Santana watched the residence, he saw a woman leave under circumstances suggesting a drug sale. This woman was stopped as the car in which she was a passenger left the scene. Seeing the officers, she attempted to throw methamphetamine out the window. When confronted, the woman stated she had just purchased the drug from appellant inside appellant's house. The woman was arrested. Santana and other officers then returned to the sheriffs substation to develop a plan. Officer Marlow was left to watch the residence for any further trafficking. Santana was familiar with appellant's prior felony history and the layout of her house. He decided to conduct a search pursuant to her Fourth Amendment waiver. He chose to approach the house from the point people were exiting. At about 1:30 p.m., as Santana and other officers were returning, Marlow saw appellant appear to engage in what his experience indicated was yet another drug transaction, this time with an Hispanic male in the driveway of her house. As that man, "Sammy," drove off, he too was stopped and arrested when he, too, was found to possess methamphetamine.
Thus, as Santana and his team approached appellant's house, they fully understood they were walking toward a residence where continuous drug transactions were then taking place. The officers were dressed in safety clothing, black ballistics vests displaying the word "sheriffs" and black caps stating "sheriffs narcotics." Unlike my colleagues, I am comfortable concluding the officers justifiably believed they were in a potentially volatile situation which went beyond "generalized fear" of drug trafficking.
As Santana and his unit rounded a corner of the house, he came "face to face" with Thomaselli, who was clutching an unknown object or objects. Unable to immediately determine who Thomaselli was and what he might have in his hand, Santana and all six members of his team subdued him just outside the open window of the house and a sliding door, loudly telling him to get on the ground, and loudly identifying themselves as officers conducting a probation search. As they did so, a dog inside began to bark. Unable to see inside through the sliding glass door because of reflecting sunlight, Santana lined up his officers and then immediately entered the residence.
This was an investigation of narcotics activity involving two contemporaneous arrests and ongoing suspicious activity where because of a confrontation the officers lost control of the knock-notice process. I do not see how this situation can reasonably be distinguished from that in Richards where the officers' drug investigation was also thwarted. In Richards it was in everyone's best interest to act quickly when the suspect recognized they were police officers and shut the door. This recognition of the officers and the easily disposable nature of the drugs excused compliance with knock notice. In this case, the officers' plan was in disarray, *218 their attention necessarily diverted from appellant and entering her house to the chaos of dealing with events outside, events the preliminary hearing judge concluded would have been apparent to anyone in the residence. While the majority faults the officers for the loss of this control, I am not willing to do so any more than I would be willing to fault the officers in Richards for using a ruse that went awry. Moreover, as Ledesma reminds us, we are not at liberty to substitute our views on how the officers should have responded, but rather we are obligated to view the reasonableness of their actions through their eyes.
The majority would have these officers, in the midst of the commotion and drug dealing around them, stand at a door they could not see through (but presumably through which they could be seen by those inside), knock and count the seconds. Given Santana's concern for his safety and that of his team, the easily disposable nature of the methamphetamine he knew was in the house and Santana's reasonable belief appellant knew sheriffs officers were present, it is not unreasonable he ordered an immediate entry.
Santana articulated events and law enforcement concerns raising a reasonable suspicion that knocking and waiting outside the door would inhibit the effective investigation of the drug sales then occurring. The totality of the circumstances supports that conclusion. The low threshold set by Richards has been met and the officers should not be criticized or law enforcement punished for complying with that threshold.

3. This court's opinion in People v. Flores is consistent with the reasonable suspicion standard set by Richards.

The majority expressly disapproves this court's opinion in People v. Flores, supra, 128 Cal.App.3d 512,180 Cal.Rptr. 368, concluding it is an opinion which relies on factors no longer sufficient under current law. (p. 204.) I disagree.
I would first observe the majority misinterprets the factual basis for our decision in Flores when it concludes the decision relies upon two factors, i.e., the existence of drug sales and the fact the occupants were warned the police were present, (pp. 204-205.) As the quotation the majority relies upon states, these two factors were included in the specific facts known to the officers.
The facts in Flores are essentially identical to those here. The officers there possessed a warrant for a residence where heroin sales were then taking place. The officers were actively involved in observing the defendants around the house and observing the drug sales. Before the warrant could be served, they were recognized and one defendant ran back toward the house. The officers ordered him to stop and went to the open screen door of the house. They announced their presence and purpose and, after one or two seconds, entered thinking any more heroin inside might be destroyed.
While it is true there are no facts in Flores which suggest any remaining occupants of the house were then attempting to destroy drugs, arm themselves or flee, there is no doubt our court found an emergency existed which allowed for an immediate entry. The question is whether that emergency would allow an immediate entry under Richards. I believe it would. With a heroin investigation involving active drug sales rapidly unfolding around the police, a defendant in flight and stopped outside the residence and a reasonable belief the occupants remaining in the house and still in possession of heroin knew there *219 were now officers outside who undoubtedly were about to arrest them, it would seem to me that the effective investigation of the crime was, in the terminology of Richards, "inhibited."
Given the uncontrolled and dangerous situation rapidly unfolding in Flores, we were entirely correct in excusing compliance with knock notice, and Richards supports that conclusion.
Finally, the majority correctly notes Flores does not cite the decision in People v. Gastelo (1967) 67 Cal.2d 586, 63 Cal. Rptr. 10, 432 P.2d 706. There is, however, a reason. It did not need to. Gastelo is a case where the police, based on past experience, had only a generalized fear of drugs on the premises. They peacefully approached the front door and failed to comply with the knock-notice requirements. They were not, as were the officers in Flores, in the middle of concurrent drug sales and physical confrontation with suspects. The same analysis applies to People v. Neer (1986) 177 Cal.App.3d 991, 223 Cal.Rptr. 555.
The majority concludes the rationale of Flores is no longer sufficient. I would find that under the reasonable suspicion standard set by Richards, our decision in Flores now has a clear constitutional basis.

B. Substantial Compliance

I also disagree with my colleagues on the issue of substantial compliance. The majority finds a lack of substantial compliance because the officers did not intend to comply with knock and notice requirements and because, in any case, they did not wait a sufficient time between any announcement given and entry.

1. The Law of Substantial Compliance
Mere technical violations of knock and notice requirements do not offend the Fourth Amendment such that suppression of evidence is appropriate. The Constitution is satisfied if there is substantial compliance with those requirements. Substantial compliance has been described as "`"actual compliance in respect to the substance essential to every reasonable objective of the [Fourth Amendment announcement requirement]," as distinguished from "mere technical imperfections of form."'" [Citation.] The essential inquiry is whether under the circumstances the policies underlying the knock-notice requirements were served. [Citations.]' [Citation.]" (People v. Hoag (2000) 83 Cal.App.4th 1198, 1208, 100 Cal. Rptr.2d 556.) Stated more simply: "When police procedures fail to conform to the precise demands of the [Fourth Amendment] but nevertheless serve its policies we have deemed that there has been such substantial compliance that technical and, in the particular circumstances, insignificant defaults may be ignored." (People v. Peterson, supra, 9 Cal.3d at p. 723, 108 Cal.Rptr. 835, 511 P.2d 1187.)
We require announcement before entry to avoid violence and to protect privacy. (People v. Peterson, supra, 9 Cal.3d 717, 723, 108 Cal.Rptr. 835, 511 P.2d 1187; People v. Hoag, supra, 83 Cal.App.4th at p. 1203, 100 Cal.Rptr.2d 556.) In light of this policy, substantial compliance is achieved when, while there is some omission or defect in the announcement provided, the circumstances are such that the risk of violence or violation of privacy is no greater than it would have been had full technical compliance occurred. In dealing with the issue of substantial compliance the inquiry remains one under the Fourth Amendment. The ultimate question, therefore, is the reasonableness of the officers' conduct in light of the policy bases for the announcement requirement under the circumstances in which the officers act. *220 (See generally Wilson v. Arkansas, supra, 514 U.S. at p. 930, 115 S.Ct. 1914; People v. Hoag, supra, 83 Cal.App.4th at p. 1209, 100 Cal.Rptr.2d 556.)

2. Discussion

a. Attempt to comply
The majority asserts substantial compliance can only occur when there has been some attempt to comply with knock and notice requirements. The majority notes that after the officers' loud confrontation with Thomaselli next to the open window of appellant's house, a confrontation in which they identified themselves as sheriffs deputies and stated they were conducting a probation search, they entered the house within seconds without further notice. It is certainly the case that until they had entered the house, the officers did not intend to, nor after the confrontation attempt to, give additional notification of their authority and intention. This is understandable since at that point they believed exigent circumstances existed allowing immediate, unannounced entry. The officers' lack of intent and attempt to give notice, however, is irrelevant because the law of knock and notice is ultimately concerned with whether notice was given, not what the officers intended.
The majority cites footnote 3 in People v. Hall (1971) 3 Cal.3d 992, 998, 92 Cal. Rptr. 304, 479 P.2d 664, for the proposition that a lack of intent to give notice is determinative, (p. 205.) Footnote 3 of Hall states: "[Substantial compliance] can occur only when, as in the instant case, there has been some attempt to comply. [Excused compliance] can occur in cases wherein the attempt to comply falls short of substantial compliance and also in cases ... wherein there has been no attempt to comply. [Citation.]"
The court in Hall was not pronouncing an inclusive rule or using closely tailored language; it was simply describing a difference between two types of entries. Because excused compliance entries normally involve no attempt at announcement and because the excused compliance cases cited by the court were of that type, the court, understandably, made its point by stating that in substantial compliance cases there had to be some attempt at compliance. Certainly, the court did not mean that in situations where in light of events the occupants of a house are on notice that officers are present to lawfully conduct a search or make an arrest and where the policies of the announcement rule, under the circumstances, are fully served, exclusion is required simply because the officers did not intend to or attempt to give additional notice. Such a rule would not only be illogical but would ignore the policy basis of the announcement rule which is, after all, supposed to guide our analysis.

b. Chance to Admit Officers
Ultimately, for the majority this case turns on the failure of the officers to wait more than five to seven seconds after their loud and informative confrontation with Thomaselli outside a door and open window before going through the sliding glass door of appellant's house.
In general, the announcement rule requires that after officers give notice they must wait a reasonable period of time under the circumstances to allow occupants the chance to admit them. (See Wilson v. Arkansas, supra, 514 U.S. at pp. 931-936, 115 S.Ct. 1914; People v. Hoag, supra, 83 Cal.App.4th at pp. 1206-1207, 100 Cal. Rptr.2d 556; Brunn, Cal. Judges Benchbook: Search and Seizure (Cont. Ed. Bar 2d ed. 2002) Opportunity to Surrender Premises, § 2.102, pp. 117-119.)
Courts have held that this requirement does not serve the avoidance of violence *221 policy supporting the announcement rule because, if officers have a lawful basis for entry, the occupants have no right to refuse admittance. Once the officers announce their authority and occupants know they are present and why they are present, there is no reasonable danger the occupants will violently resist entry because they fear a criminal intrusion. (People v. Hoag, supra, 83 Cal.App.4th at pp. 1211-1212, 100 Cal.Rptr.2d 556; People v. Trujillo (1990) 217 Cal.App.3d 1219, 1227, 266 Cal.Rptr. 473; People v. Uhler (1989) 208 Cal.App.3d 766, 770, 256 Cal.Rptr. 336.)
The rule then must implicate the protection of privacy aspect of the announcement requirement. However, the right of privacy in this context is a limited one. In every announcement case the officers have the right to enter. Admittance may not be refused. As we use the term "privacy" in such cases, the right is less ethereal and more practical, i.e., allowing occupants to get out of bed or get dressed and thus see who is at the door. (See Richards v. Wisconsin, supra, 520 U.S. at p. 393, 117 S.Ct. 1416.)
An insufficient delay period is not in itself conclusive on the question of whether an occupant's limited privacy right has been violated. In order to determine whether such a violation of privacy has taken place, we are required to examine the circumstances surrounding the entry, including such factors as the time of day, size of the house, the occupant's knowledge of the presence and purpose of the officers and whether there is movement and lack of response to a known announcement. (See People v. Hoag, supra, 83 Cal.App.4th at pp. 1211-1212, 100 Cal.Rptr.2d 556; People v. Tacy (1987) 195 Cal.App.3d 1402, 1421-1422, 241 Cal.Rptr. 400; People v. Uhler, supra, 208 Cal.App.3d at pp. 768-770, 256 Cal.Rptr. 336; People v. Trujillo, supra, 217 Cal.App.3d at p. 1228, 266 Cal. Rptr. 473.)
In the present case officers were aware that even during their mid-day arrival, appellant was up and about, selling drugs from her house and was engaged in drugrelated conduct as she talked to an individual in the driveway area. She was on probation subject to a Fourth Amendment waiver. In confronting Thomaselli, the six officers loudly and collectively announced they were sheriffs deputies present to conduct a probation search. Given the location and intensity of their actions, the judge at the preliminary hearing concluded the officers made an effective announcement of their identity and intention to conduct a search and appellant would have heard them and could have responded. As the court noted, the duration and volume of the commotion served the same purpose as a knock. Moreover, having been selling drugs, appellant could not have been surprised by their presence. I would conclude any violation of appellant's privacy was minimal at best.[2]
Under all the circumstances of this case, the interests of safety and privacy central to the announcement rule were served by the circumstances by which the officers entered.

C. Inevitable Discovery
While application of either exigency or the substantial compliance doctrine offers a sufficient basis for affirming the judgment, I believe it necessary to comment on my colleagues' inevitable discovery analysis.
*222 The majority elects to address whether the inevitable discovery rule applies to cases involving knock and notice violations.[3] In so doing, my colleagues hold (1) the showing necessary for inevitable discovery to apply can seldom be made in the context of knock and notice violations, (2) the inevitable discovery doctrine should not apply to knock and notice violations because it would swallow the knock-notice rule and (3) the inevitable discovery doctrine cannot be applied on the facts of this case. (pp. 210-212.)
There are courts that hold inevitable discovery can seldom be established where there has been a knock and notice violation because the required showing "cannot usually be made in the context of a knocknotice violation." (p. 211.) However, a cursory review of two of those cases relied upon by the majority reveals that they base this conclusion on the erroneous belief that inevitable discovery requires an independent, untainted investigation. (U.S. v. Dice (6th Cir.2000) 200 F.3d 978, 984-985, and cited with apparent approval in State v. Lee (2003) 374 Md. 275, 821 A.2d 922.)[4] The majority cites with approval the faulty reasoning of Dice and Lee. (pp. 211-212.) Of course Nix (Nix v. Williams (1984) 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377), and the courts of this state, hold inevitable discovery may exist where, in the same investigation, alternative legal means would have led to the same evidence. (People v. Thierry (1998) 64 Cal.App.4th 176, 180, 75 Cal. Rptr.2d 141; People v. Saam 1980) 106 Cal.App.3d 789, 797, 165 Cal.Rptr. 256; see also 5 LaFave, Search and Seizure (1996) § 11.4, pp. 234-253.)
I also disagree with my colleagues' conclusion that application of inevitable discovery in knock-notice violations would eviscerate the knock-notice protections.
As the majority notes, a split of authority exists on the question of whether the doctrine of inevitable discovery should, as a policy matter, apply where there has been a violation of the knock and notice requirement. The majority, like other courts, is unwilling to apply inevitable discovery to knock-notice violations because it concludes that its application would permit the police to entirely ignore the knock and announcement requirements of the Fourth Amendment. (pp. 211-212; United States v. Shugart (E.D.Tex.1995) 889 F.Supp. 963, 976.) In particular, it rejects the deterrent impact of administrative discipline and civil liability. In doing so, however, my colleagues part company with the Nix majority which addressed and dismissed their concerns.
In rejecting the appellant's argument that inevitable discovery should only be applied if the officers acted in good faith, the court in Nix stated: "[W]hen an officer is aware that the evidence will inevitably be discovered, he will try to avoid engaging in any questionable practice. In that situation, there will be little to gain from taking any dubious `shortcuts' to obtain the evidence. Significant disincentives to obtaining evidence illegallyincluding the possibility of departmental discipline and *223 civil liabilityalso lessen the likelihood that the ultimate or inevitable discovery exception will promote police misconduct. [Citation.] In these circumstances, the societal costs of the exclusionary rule far outweigh any possible benefits to deterrence that a good-faith requirement might produce." (Nix v. Williams, supra, 467 U.S. at pp. 445-446, 104 S.Ct. 2501, italics added.)
The Nix rationale is applicable to knocknotice violations. Armed with a warrant or its functional equivalent, and in the absence of circumstances which excuse compliance, police officers have little at all to gain by failing to knock and announce their presence. Indeed, where compliance is not excused by the exigencies of the situation and discovery is inevitable, failing to knock and notice will only make the officer's life more difficult and give any occupant who resists the officer not only a civil remedy but a potential defense to any criminal charge growing out of the resistance. (See People v. Stevens (1999) 460 Mich. 626, 597 N.W.2d 53, 64; see also U.S. v. Longford (7th Cir.2002) 314 F.3d 892; People v. Hoag, supra, 83 Cal. App.4th at p. 1212, 100 Cal.Rptr.2d 556 (Morrison, J., concurring.)
Moreover, a blanket refusal to apply the inevitable discovery doctrine to knock and notice cases leads to unreasonable results. For example, one can easily envision a situation where there have been multiple entries into a residence. At the front door the police violate the knock-notice rule and upon entry search and discover methamphetamine. At a second door the police encounter an individual who permits them to enter and search. The Shugart rationale adopted by the majority combined with the requirement of an independent investigation would hold the evidence must be suppressed even though the evidence would have been inevitably discovered by virtue of the entirely proper police procedures at the second door. The same result would occur if the police enter in violation of knock and notice rules and, based on information obtained prior to the entry, began the process of obtaining a warrant which would have resulted in discovery of the evidence.
Unlike my colleagues, I proceed on the assumption law enforcement officers obey the law and I see no impediment to application of the inevitable discovery doctrine in knock-notice cases.
Finally, I believe the evidence in this case would have been inevitably discovered. In cases that reject application of the doctrine to knock-notice violations, the definition of "inevitable discovery" has at times been severely limited to instances where the prosecution can establish proper and predictable investigatory procedures would have been utilized such that law enforcement would have acquired the evidence. (See State v. Lee, supra, 821 A.2d at pp. 939-940.) I am not convinced such a restrictive definition is appropriate.
The term "inevitable discovery" is a misnomer. (Brunn, Cal. Judges Benchbook: Search and Seizure (Cont. Ed. Bar 2d ed. 2002) Basic Principles, § 160, pp. 39-40.) The doctrine does not require inevitability or certainty but rather requires "reasonable probability." (People v. Bayer (1989) 48 Cal.3d 247, 278, 256 Cal.Rptr. 96, 768 P.2d 610; People v. Superior Court (Tunch) (1978) 80 Cal.App.3d 665, 681, 145 Cal.Rptr. 795.) In determining whether reasonable probability of discovery is present, significant factors to be examined include whether the police were involved in a broad-based investigation at the time the illegality occurred and whether there were in place "usual and commonplace police investigative procedures" which would have led to the evidence irrespective of the Fourth Amendment violation. (Brunn, *224 Cal. Judges Benchbook: Search and Seizure (Cont. Ed. Bar 2d ed. 2002) Basic Principles, § 160, pp. 39-0; see also People v. Saam, supra, 106 Cal.App.3d at p. 797, 165 Cal.Rptr. 256.)
Inherent in the inquiry as well is the temporal aspect of the seizure: whether there is a causal connection between any tainted knock and notice entry and the discovery of the evidence seized. (See People v. Stevens, supra, 597 N.W.2d at p. 60.)
It is possible officers who enter with knowledge of a Fourth Amendment waiver, and obtain entry by violating knock and notice requirements, may find evidence that is directly related to the illegal entry. This might be the case, where, for example, officers in search of drugs enter by violation of knock-notice and in plain view see a computer screen with illegal pornography displayed. The discovery of the pornography is a direct and sole result of the illegal entry. That situation differs from our case. Here, the officers knew not only of appellant's search waiver, but independently observed drug activity outside the house. They arrested an individual who admitted just purchasing methamphetamine from appellant in her house. A second suspected purchaser was detained and then arrested.
Because of appellant's Fourth Amendment waiver, she was required to allow a search of her residence. Having viewed the drug activity and having made an arrest, it is reasonable to expect the officers were not going away. Indeed, the preliminary hearing judge made such a finding. Sooner or later, they were going to interrogate or arrest appellant, and it is reasonable to assume that when confronted with the evidence observed by the officers, appellant would have told them the same information and directed them to the same drugs inside the house. In such a situation the entry is not the sole cause of the discovery of evidence. (See Green v. Superior Court (1985) 40 Cal.3d 126, 137, 219 Cal.Rptr. 186, 707 P.2d 248; Wayne v. United States (D.C.Cir.1963) 318 F.2d 205, 209, cert. den. 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86.)
I conclude the inevitable discovery doctrine asks whether there would probably have been discovery of the evidence by an untainted means. I would further find such probability exists where, as here, law enforcement officers would have under all possible circumstances interrogated or arrested the defendant, and thus the knock and notice violation was not the sole cause of discovery of the evidence.
For the reasons stated I would find there is no basis upon which to suppress the evidence in this case. I would affirm the judgment.
NOTES
[1] All statutory references are to the Penal Code unless otherwise specified.
[2] Because this appeal was taken from a guilty plea and Murphy stipulated in the trial court to the facts as adduced at the preliminary hearing, the factual background set forth in this opinion is drawn from the preliminary hearing transcript, taken in the light most favorable to sustaining the court's findings. (See People v. Gonzales (1991) 233 Cal.App.3d 1428, 1434, 285 Cal.Rptr. 218, citing § 1538, subd. (i).)
[3] It is undisputed that Murphy was on probation on the day in question and that she had consented to warrantless searches of her residence as a condition of that probation.
[4] Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[5] Section 844 is a similar knock-notice provision pertaining to arrests. Although Murphy relies on section 844 in addition to section 1531, the purpose of the entry into her home was to conduct a probation search, not to effectuate an arrest. Accordingly, "the provisions of Penal Code section 844 do not govern the instant situation." (People v. Constancio, supra, 42 Cal.App.3d at p. 542, fn. 7, 116 Cal.Rptr. 910 [concluding probation search that resulted in an arrest was governed by principles enumerated in section 1531 rather than section 844].)
[6] Although not elucidated in the Richards opinion itself, the United States Supreme Court in the landmark case of Terry v. Ohio (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 explained the essence of the concept of reasonable suspicion in discussing the standard necessary to justify an investigatory stop: "[A] police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." (Id. at pp. 21-22, 88 S.Ct. 1868, italics added.)
[7] See part 111(A)(2) for our rejection of this rationale for the entry.
[8] See also United States v. Granville (9th Cir. 2000) 222 F.3d 1214, 1218 (reversing district court's denial of a motion to suppress evidence gained in a search because "[t]he five seconds [the police officer] waited [after knocking and announcing his presence] before forcing his way into [the defendant's] apartment simply did not provide [the defendant] with a reasonable opportunity to ascertain who was at the door and to respond to [the officer's] request for admittance" and noting that "the shortest wait [the Ninth Circuit has] upheld is ten seconds").
[9] The only testimony on the timing of the entry in this case was from the officers themselves who stated that they entered the house five to seven seconds after the initial announcement. The People have acknowledged both below and in this court that the entry occurred "about five to seven seconds" after the initial announcement. Although the judge at the preliminary hearing stated that he thought "it was probably longer" than five to seven seconds, he neither made an express nor implied finding to that effect, and there was no evidentiary basis for such a finding.
[10] In that regard, we also reject the People's reliance on United States v. Bustamante-Gamez (9th Cir. 1973) 488 F.2d 4 (Bustamante-Gamez ) in support of their argument that the failure to wait a sufficient amount of time after announcement, but before entry, is "relatively unimportant." Since the decision in Bustamante-Gamez, the United States Supreme Court has twice expressly stated that "the opportunity to comply with the law" is an important interest served by knock-notice requirements. (Richards, supra, 520 U.S. at p. 393, fn. 5, 117 S.Ct. 1416, citing Wilson v. Arkansas (1995) 514 U.S. 927, 930-932, 115 S.Ct. 1914, 131 L.Ed.2d 976.)

In any event, it is clear that under the standard adopted in Bustamante-Gamez, the entry in this case was improper. (See Bustamante-Gamez, supra, 488 F.2d at p. 12 ["an explicit refusal of admittance or lapse of a significant amount of time is necessary if the officers have no facts indicating exigency"], italics added.)
[11] That provision provides in pertinent part: "relevant evidence shall not be excluded in any criminal proceeding...." (Cal. Const., art. I, § 28, subd. (d).) The California Supreme Court has held that this provision cannot affect exclusionary rule provisions mandated by federal law. (In re Lance W. (1985) 37 Cal.3d 873, 890, fn. 11, 210 Cal.Rptr. 631, 694 P.2d 744.)
[12] The United States Supreme Court declined to address the issue of the potential application of the inevitable discovery doctrine in Wilson because the issue had not been addressed by the court below and was not within the scope of the question on which it had granted certiorari. (See Wilson v. Arkansas, supra, 514 U.S. at p. 937, fn. 4, 115 S.Ct. 1914.)

We note that the Ninth Circuit in United States v. Banks (9th Cir.2002) 282 F.3d 699, certiorari granted 537 U.S. 1187, 123 S.Ct. 1252, 154 L.Ed.2d 1018, recently applied the exclusionary rule without discussing the inevitable discovery doctrine. The Justice Department has argued for the application of the doctrine in its brief before the United States Supreme Court. (See United States v. Banks (U.S. Supreme Ct., 2003, No. 02-473) Brief of the United States of America, 2003 WL 21108421.)
[13] Respected commentators agree. (See 5 LaFave, Search and Seizure: A Treatise on the Fourth Amendment (2003 supp.) § 11.4, pp. 46-48.)
[14] The Ninth Circuit and the California Supreme Court have both recently rejected a similar attempt to extend the inevitable discovery doctrine to cases in which the police could have, but did not, seek a warrant where one was required. "To excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." (U.S. v. Reilly (9th Cir.2000) 224 F.3d 986, 994-995; see People v. Robles, supra, 23 Cal.4th at p. 801, 97 Cal.Rptr.2d 914, 3 P.3d 311 [inevitable discovery doctrine would not serve to excuse warrantless search of residence].)
[1] One year after Richards in U.S. v. Ramirez (1998) 523 U.S. 65, 118 S.Ct. 992, 140 L.Ed.2d 191, the Supreme Court stated that the relatively undemanding test for when an unannounced entry was constitutional applied not only when entry would result in little if any property damage but also when a forcible entry was required. (Id. at pp. 69-70, 118 S.Ct. 992.)
[2] Relying on Thomaselli's testimony he was on the ground for a minute or so before he heard voices inside the house, the judge opined that at least five to seven seconds passed.
[3] Although the preliminary hearing judge briefly mentioned the inevitable discovery in his ruling, the People did not rely on the doctrine and the issue was not addressed or briefed by the parties at either the section 1538.5 hearing or the preliminary hearing.
[4] Interestingly, Dice reaches this conclusion by in part failing to quote the entirety of a passage in U.S. v. Leake (6th Cir. 1996) 95 F.3d 409, which states inevitable discovery applies where there has been either an independent untainted investigation "`or other compelling facts establishing that the disputed evidence inevitably would have been discovered.'" (Compare id. at p. 412, and U.S. v. Dice, supra, 200 F.3d at pp. 986-987.)